THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* VINCENT TOOLEN *et al.*, Defendants-Appellees.

Fifth District   Nos. 82—274 through 82—276, 82—293 cons.

Opinion filed July 14, 1983.—Rehearing denied August 10, 1983.

John R. Clemons, State's Attorney, of Murphysboro (Stephen E. Norris and Raymond F. Buckley, Jr., both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Richard E. White, Chartered, of Murphysboro, for appellee Vincent Toolen.

Mark A. Hamrock, of Murphysboro, and William L. Broom III, of Barrett, Morris and Broom, of Carbondale, for appellee Harry J. Wiggs.

D. A. McGrady, of McGrady & McGrady, and Paul C. Verticchio, of Verticchio and Verticchio, both of Gillespie, for appellee Joseph Garella.

No brief filed for appellee Ernest Allen.

JUSTICE WELCH delivered the opinion of the court:

This appeal is the result of a Jackson County grand jury investigation into the activities of employees of the Illinois Department of Administrative Services (D.A.S.), relating to the Department's Carbondale garage. Indictments were returned against Vincent Toolen, the Director of D.A.S., Joseph Garella, assistant superintendent of vehicles in D.A.S.'s Division of Vehicles, Ernest Allen, shop supervisor of the Carbondale garage, and Harry J. Wiggs, owner of Carbondale Auto Supply. The three areas of investigation pursued by the grand jury involved allegations of payment of a bribe to obtain an official position, allegations that D.A.S. employees had billed to the State auto parts which they used on personal vehicles, and allegations that employees of D.A.S. and Carbondale Auto Supply collaborated to present the State with false bids on auto parts. The indictments returned pertained to all three of these areas and alleged that the offenses of bribery, theft, forgery, official misconduct, obstructing justice and perjury had been committed by the various defendants. Pursuant to the defendants' motions, the trial court dismissed all of the indictments, and the State appeals to this court. (87 Ill. 2d R. 604(a).) Defendants Toolen, Garella and Wiggs, who have filed briefs, have moved to dismiss the State's appeals. We have taken these motions with these cases, all of which we have consolidated on our own motion. The issues raised here concern appealability, due process in the grand jury proceedings and sufficiency of the indictments. First, a recital of the evidence presented to the grand jury is necessary.

PAYMENT OF BRIBE

Defendants Allen, Wiggs and Garella were each indicted for a single count of bribery. The incident upon which these indictments were based was the alleged payment of $900 by Allen to Wiggs, who forwarded the money to Garella to obtain Allen his position with D.A.S. Defendants Toolen and Garella were also charged with perjury, obstructing justice and official misconduct through giving an incorrect account of these transactions to the grand jury or to investigators of

the Department of Law Enforcement (D.L.E.).

In his testimony before the grand jury, defendant Allen stated that he worked for D.A.S. since July 7, 1979. He had also served as a foreman at the Carbondale garage from 1966 to 1970. After that period, he purchased a flower shop and greenhouse business, and when it was destroyed by fire, he began to work for the city of Carbondale. Allen stated that in the summer of 1979 he asked Harry Wiggs to put in a good word for him with Joseph Garella in order to assist him in again securing employment with D.A.S. Wiggs later told him that he had talked to Garella, who said that "there were three people in Springfield that would have to be satisfied with some money." The amount mentioned was $600. Allen replied that he would pay that money to obtain a job with D.A.S. He was so employed that summer, but, although he did not pay Wiggs any money before he started work, Wiggs informed him that he would have to pay $900. On August 6, 1979, Allen gave Wiggs a personal check in that amount, and Wiggs assured him that Garella would receive it.

Defendant Garella denied accepting money from Allen to secure his employment. He testified that in July 1979, Allen approached him at the Carbondale garage and mentioned that he wanted to make a political contribution. Later that month, Garella was at Carbondale Auto Supply, where Wiggs gave him $900 claimed to be from Allen. The money was in nine $100 bills. Garella stated that he took the money to his home in Gillespie, Illinois, and placed it in an envelope. Because according to Garella there was no political activity in 1980, he kept the money until December 1980 or January 1981. At that time, tickets became available for a testimonial dinner for State Representative George H. Ryan. Garella testified that he purchased six tickets at $150 apiece from Jon Bauman.

Bauman, deputy director of D.A.S.'s Office of Property Management, told the grand jury that he had been given several of the Ryan tickets by defendant Toolen and was asked to sell them if he could. He agreed that he had given Garella between five and 10 of the tickets to sell. Bauman and Garella testified that while they were both in Chicago on business and staying at a hotel, Garella gave Bauman an envelope containing nine $100 bills, which Garella stated had been paid for the Ryan tickets. Garella conceded that he had earlier told D.L.E. investigators that he had given the money to Vincent Toolen. Before the grand jury, Garella stated that he told Bauman that the money was from Ernest Allen, but Bauman testified that Garella did not tell him who had purchased the tickets. Garella and Bauman both recalled that the tickets did not have stubs attached which would al-

low the name and address of the purchaser to be indicated, although Garella had informed D.L.E. investigators that he had filled out stubs for these tickets. Garella stated that Bauman did not give him a receipt, but Bauman did indicate later that he had given the money to Toolen.

Ernest Allen noted that he did not get a receipt for a political contribution or tickets to a Ryan dinner. He testified that in November 1981, he talked with Garella while Garella drove him around Springfield. According to Allen, Garella told him that his money had been used to purchase campaign tickets. Garella testified that he had informed Allen that the money had gone to Ryan, but stated that he had not discussed the contribution with Allen within six months of his grand jury testimony, which was given in January 1982.

Defendant Toolen, Director of D.A.S., testified that he received approximately 10 or 15 tickets to the dinner from Ryan's office and had given several of them to Bauman to sell. After the dinner was held on February 25, 1981, Toolen received an envelope containing money for tickets and unsold tickets. He said that some of the money was in cash, but probably not all of it. Toolen testified that he brought the money to Ryan's office in the Capitol building. Toolen entered the office through the main door, which had Ryan's name over it. Toolen did not recall to whom he presented the envelope, but he stated that it was customary for him to give the proceeds for fund raising events to one of Ryan's staff members, as opposed to a secretary or receptionist. According to Toolen, he did not inform Ryan's staff of the names or addresses of any of the ticket purchasers, although he stated that the tickets had stubs which could be filled out, and if they had been filled out before they were given to him, Ryan's staff would have been given that information. Toolen recalled that he did not receive a receipt for these contributions. Jon Bauman testified that Toolen had told him that he had delivered the money and tickets to Ryan's office.

D.L.E. investigator James Covert informed the grand jury that he had spoken with Speaker Ryan's chief of staff, Robert Knudsen. Knudsen told Covert that although Toolen had indicated that he could sell some tickets for the February 1981 dinner, none of the staff members could remember giving Toolen any tickets. According to Knudsen, if tickets were handed to someone, their numbers would not be recorded, as they would be if they were mailed. Covert testified that he spoke to everyone who worked on Ryan's staff during the period that Toolen claimed to have delivered money and tickets to their office. None of these staff members recalled receiving money or tickets

from Toolen.

Knudsen informed Covert that when an individual seeks to make a contribution to Ryan in cash, the procedure followed is to photocopy the cash and then require the individual to obtain a cashier's check so that the office would have a record of the donor's identity. The records at Ryan's Springfield and Kankakee offices failed to disclose any contributions from Vincent Toolen, Jon Bauman, Joseph Garella, Ernest Allen, Harry Wiggs or Carbondale Auto Supply. Knudsen also stated that in the last half of 1980 and the first half of 1981, Ryan's Springfield office was under repair. During that time, the main door was blocked off, and one had to enter the office through an unmarked door reached through a side hallway. In order to reach the inner staff office, in which Toolen stated that he usually turned in campaign contributions, one would have to go through Speaker Ryan's private office and not through the reception area, as would normally be required, and as Toolen indicated he did.

Covert testified that he visited the offices of the Illinois State Board of Elections, where he was told that if an individual made a contribution of more than $150 to one candidate or office holder in a single year, it would have to be reported to the Board. Covert examined Ryan's campaign financial records at the Board and determined that no contribution of greater than $150 was made for the February 1981 dinner by Toolen, Bauman, Garella, Allen, Wiggs or Carbondale Auto Supply.

John Wininger, who was a 49% shareholder in Carbondale Auto Supply, testified that Garella occasionally stopped by the store to speak with Wiggs. It was Wininger's understanding that Garella came to accept political contributions from Wiggs, that these contributions were usually in cash and that Wiggs had received tickets in return for his contributions. However, Wininger also recalled that Wiggs had told him that he had forwarded a contribution from Allen to Garella in order to secure Allen's job at D.A.S.

### FALSE BILLING OF AUTO PARTS

The witnesses who testified before the grand jury on the issue of State employees accepting auto parts for personal use and billing them to the State may be considered in two categories: those employed by the Carbondale garage and those employed by Carbondale area auto parts stores, primarily at Carbondale Auto Supply.

Paul Escue and Derald Snyder worked at the Carbondale garage. Escue stated that over the course of his 13 years of employment at the garage, he had obtained parts for himself and other State employ-

ees from Carbondale Auto Supply and those parts had been billed to the State as something else. Snyder, who worked at the garage from 1977 to 1981, was often assigned to retrieve parts from auto parts stores for the garage. He first became aware of the false billing practices when he had to obtain parts for vehicles, such as Cadillacs, which were not owned by the State. Escue and Snyder dealt with the sales personnel at Carbondale Auto Supply, and only infrequently with Wiggs himself. However, both Escue and Snyder were of the opinion, based on conversations with Wiggs and the counter personnel, that Wiggs was aware of these practices. In fact, Snyder testified that Wiggs had indicated that Escue could have any parts he wanted. He also stated that Wiggs had told him that if he did not furnish law enforcement authorities with information about the billing practices, he could have him transferred as a reward. Escue named several D.A.S. employees who had received parts and estimated that between $500 and $1,000 worth of parts were obtained in this manner each month. Defendant Allen testified that he was unaware of these practices, but he did say that he had told Wiggs in October 1979 not to allow D.A.S. employees to accept parts without the proper number on the bill, or parts which were not for State vehicles.

Carbondale Auto Supply sales counter personnel Jack Peterman, William Fuson, David Crawshaw and Gene Hankins presented testimony to the grand jury. Peterman, Fuson and Crawshaw recalled that they had, on occasion, written up bills for D.A.S. personnel which did not reflect the items which had been given to those individuals. Peterman and Fuson stated that Wiggs had specifically authorized these procedures while Crawshaw testified that although Wiggs might have known about it, he did not instruct him directly to do so. According to Peterman and Fuson, when a part was incorrectly billed, they would fill out a piece of scratch paper to indicate the part which was actually sold, so as not to upset the store's inventory. Fuson said that he accomplished this task by placing a pencil mark on the bill. Peterman and Crawshaw testified that these billing practices were stopped at about the time D.L.E. commenced its investigation.

Hankins testified that he was aware that "inventory swaps" occurred and that Wiggs had permitted the practice. However, he said that this took place only in emergencies, where, for example, the State needed an item between bids. The single such transaction which he recalled making with Escue was an instance in which he exchanged a jack for an alternator.

Gary McCarthy, who kept the inventory at Carbondale Auto Supply, testified twice before the grand jury on January 14, 1982. In his

first appearance, he stated that although he was aware that auto parts had been billed as other than what they were, he did not know specifically that this had occurred for parts sold to D.A.S., nor had he sold parts to D.A.S. employees which were then billed as something else. He said that he knew that, as Fuson testified, D.A.S. employees Snyder and Gary Gibbs had refused to accept parts which were not listed correctly on the bill. According to McCarthy, on only one occasion did Wiggs tell him to bill a part as something else, and this involved an emergency where the garage needed a battery to start a car. McCarthy also explained that if an item were not properly billed, a notation would be made on scratch paper to show what item should be re-ordered. If he received an invoice with a check mark on it, he would not list that item as being removed from inventory.

After McCarthy gave this testimony, D.L.E. investigator William Barrett spoke to him in the courthouse hall and then testified concerning their conversation. Barrett indicated that McCarthy had expressed concern whether he had given accurate information to the grand jury. McCarthy told Barrett that he was aware that parts may have been given to the State and billed as something else and that he may have done so on occasion but could not recall a specific incident. He further said to Barrett that he was of the impression, through conversation in the store, that some of these parts may have been for the personal use of D.A.S. employees.

In his second appearance before the grand jury, McCarthy admitted that he knew of instances in which the State accepted parts that were billed as something else. Although he, as a counter salesman on occasion, would not know where these parts would be used, he became suspicious that these parts were not for State vehicles because parts were ordered for such cars as Cadillacs and a 1948 or 1949 Dodge. McCarthy stated that he did not remember Harry Wiggs telling him that he could engage in this sort of billing for Escue and other State employees, but he thought that Jack Peterman told him that Wiggs had approved these practices.

John Wininger testified that while he worked at Carbondale Auto Supply, D.A.S. employees such as Escue would order parts and they would be billed as something else. While he did not hear Wiggs instruct the counter sales personnel to engage in these activities, Wininger was of the opinion that Wiggs was aware of the false billing and acquiesced in it. Wininger billed parts for Escue in this manner on occasion, and when this occurred, Wininger would make a slash mark or a circle on the invoice to show that that article remained in inventory.

BID RIGGING

The final allegations of criminal activity investigated by the grand jury concern the submission of fraudulent auto parts bids to the State. The two primary witnesses on this issue were Derald Snyder and Paul Escue. Snyder testified that he witnessed bid rigging by Escue on four or five occasions and participated in it once. It was Snyder's understanding that for certain parts orders three bids would have to be obtained. However, instead of calling three auto parts stores, Escue would take three bid forms to Wiggs who would fill all of them out and sign them. The result of this procedure would be that only one actual bid would be obtained, even though the forms would reflect that three bids were received. It would also show that Carbondale Auto Supply was the low bidder.

Paul Escue stated that the accepted bid procedure at D.A.S. was to obtain three bids from auto parts suppliers, either by phone, or in person, in which case the suppliers would fill out bid forms. In four to six instances, he called Carbondale Auto Supply but no other suppliers. Nonetheless, he would write up bid forms to show that three suppliers had been contacted. Escue told the grand jury that the parts involved in these transactions were usually worth $300 or more. He also indicated that there were occasions in which he obtained three bids from suppliers and if Carbondale Auto Supply were not the low bidder, Escue would contact Carbondale Auto Supply again and allow them to submit another bid in order to secure the purchase. According to Escue, Wiggs knew of these practices, approved of them and in fact instructed him to continue with them.

John Wininger testified that he had heard that the grand jury was investigating allegations of bid rigging at Carbondale Auto Supply, but, as he did not work with bids for the Carbondale D.A.S. garage, he was not aware of these practices. However, he agreed that it was possible that they had occurred. In his appearance before the grand jury, defendant Wiggs exercised his fifth amendment right to remain silent.

APPEALABILITY

The first issue presented by these consolidated cases is whether the State has properly perfected an appeal to this court. This has been raised by motions to dismiss the appeals filed in the Toolen, Wiggs and Garella cases. The procedural histories of these cases are similar but not identical.

A four-count bill of indictment was filed against Toolen, while seven counts were filed against Wiggs and 14 counts were filed

against Garella. On April 12 and 13, 1982, Wiggs filed motions to dismiss all counts of the indictment. Garella moved on April 14 to dismiss all counts against him and on April 16, Toolen filed a series of motions seeking the same relief in his case. A consolidated hearing was held on these motions on April 19, 1982, during the course of which the court orally dismissed counts III through VII against Wiggs, counts III, VIII, XI, and XII against Garella, and counts II, III and IV against Toolen. No written orders of dismissal were entered.

Wiggs filed two motions for reconsideration of the court's rulings. The first of these, directed only toward the ruling on count II, was filed on April 22, 1982, and the second, pertaining to remaining counts I and II, was filed on April 26. A hearing was held on the first motion on April 29. At that time, the court reconsidered its earlier ruling and orally dismissed count II against Wiggs. A written order dismissing this count was not entered.

On April 28, Toolen filed a motion for reconsideration of the court's ruling on remaining count I against him. Garella filed a motion to reconsider on May 3, 1982, which motion pertained to remaining counts I, II, IV through VII, IX, X, XIII and XIV in his case. These motions were heard, together with Wiggs' April 26 motion, on May 13. The court granted the motions of all three defendants, stating, "I find that there was a breach of substantial due process in this particular case. I am so holding. I will certify this question to any court, either the Appellate Court or the Supreme Court, upon the request of the State's Attorney because I am now granting the motion to dismiss the indictment."

On May 17, 1982, the People filed notices of appeal in all three cases. The notices in the Toolen and Garella cases indicated that the appeals were being taken from the oral orders of April 19, and the "Hearing and Oral Ruling - May 13, 1982 (Written Order not yet entered)." The notice of appeal in the Wiggs case additionally referred to the oral order of April 29, 1982. Docket entries in all three cases reflected that the May 13, 1982, rulings were "all as per order to be signed," and written orders memorializing those rulings were filed in all three cases on May 26.

The argument of the defendants is that the State's appeal was premature, for no written order confirming the May 13 dismissals was entered until after the State's notice of appeal was filed. They draw an analogy to Supreme Court Rule 272, which is not applicable to criminal appeals. It states, in part, "If at the time of announcing final judgment the judge requires the submission of a form of written

judgment to be signed by him, the clerk shall make a notation to that effect and the judgment becomes final only when the signed judgment is filed." (87 Ill. 2d R. 272.) They contend that under this rule, the State did not appeal from a final order and therefore this appeal should be dismissed.

The rationale of Rule 272 has been employed in several criminal cases. In *People v. Boston* (1975), 27 Ill. App. 3d 246, 327 N.E.2d 40, the trial court orally granted defendants' motions for discharge on speedy trial grounds, indicating that a written order would be prepared. The State filed its notices of appeal after that oral ruling but before the filing of written orders. We held that no order was in existence at the time that the State filed notices of appeal, and thus we lacked jurisdiction to consider the appeal.

A similar result was reached in *People v. Deaton* (1974), 16 Ill. App. 3d 748, 306 N.E.2d 695. On June 14, 1973, a hearing was held on defendant's motion to suppress evidence, at the conclusion of which the court indicated that the motion "is granted." The People filed a notice of appeal the same day. A written order was entered after the notice of appeal was filed. The court analogized to *Davidson Masonry & Restoration, Inc. v. J. L. Wroan & Sons, Inc.* (1971), 2 Ill. App. 3d 524, 275 N.E.2d 654, and remarked, "There, as here, the notice of appeal was given at a time when there was not in existence a judgment order. The record, as did the record in the cited case, clearly indicates that the parties were aware of the filing of the order that was contemplated by the statute." (16 Ill. App. 3d 748, 749, 306 N.E.2d 695, 696.) Under these circumstances, the court dismissed the appeal. See also *People v. Cook* (1981), 94 Ill. App. 3d 73, 418 N.E.2d 457.

In *People v. Allen* (1978), 71 Ill. 2d 378, 375 N.E.2d 1283, our supreme court declined to apply the reasoning of Rule 272 to a defendant's appeal from a conviction and sentence. It held that a notice of appeal filed between the oral pronouncement of a sentence and the filing of a written order was timely because the Code of Criminal Procedure of 1963 defines a judgment as "an adjudication by the court that the defendant is guilty or not guilty and if the adjudication is that the defendant is guilty it includes the sentence pronounced by the court." (Ill. Rev. Stat. 1981, ch. 38, par. 102—14.) The 30-day period in which a defendant may appeal thus begins to run when the court pronounces sentence. *People v. Ervin* (1982), 103 Ill. App. 3d 465, 431 N.E.2d 453.

The People argue that, while the supreme court did not explicitly overrule *Boston* or *Deaton,* it did so impliedly by rejecting Rule 272 in

the context of a defendant's appeal from a conviction and sentence. They assert that there is no basis for differentiating between a sentencing order and an order of dismissal and therefore, under *Allen*, the pronouncement of an order of dismissal is the judicial act which is simply evidenced by a subsequent written order. We need not decide whether *Boston* and *Deaton* survive *Allen* (compare *People v. Ervin* with *People v. Eddington* (1978), 64 Ill. App. 3d 650, 381 N.E.2d 835), for the rule of *Boston* and *Deaton* is inapplicable by its own terms.

As *Deaton* suggests, an oral pronouncement will not be an appealable order only if it is apparent of record that the parties are aware that a written order is to follow. In *Boston*, the court specifically indicated at a hearing that a written order would be filed. (See also *People v. Cook* (judge issued decision in letter which requested counsel to draft an order).) This did not occur in the case at bar, for the court merely indicated that the motions had been granted. In *Deaton*, the court did not mention that a written order would be entered, but apparently it did not give the reasons for its suppression ruling at the hearing. Although section 114—12(e) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 114—12(e)) does not specifically require a written order of suppression (*People v. Keath* (1981), 101 Ill. App. 3d 652, 428 N.E.2d 992; see also *People v. Winters* (June 17, 1983), No. 56753), the absence of findings of fact and conclusions of law in an oral ruling suggest that a written order would be filed to supply those findings and conclusions. The parties in *Deaton* could be said to have been on notice, then, that a written order would follow.

The trial judge did not inform the parties at the May 13 hearing that a written order would be filed. Nor can we agree that the record affirmatively shows that the parties were aware that such an order would follow. The court's oral pronouncement was not incomplete, as it may have been in *Deaton*, and could not be said to have placed the parties on notice that the pronouncement would be completed by a later order. We acknowledge that a docket entry of May 13 indicates that an order would be signed, but there is nothing of record to suggest that this was brought to the attention of the State. Nor do we believe that the notation "written order not yet entered" on the notices of appeal manifests such an awareness on the part of the State. That phrase suggests simply that no such order had been entered by the time the notices of appeal were filed, and does not necessarily imply that a written order will be filed. The record in the case at bar thus fails to demonstrate that the State knew or should have known that the court would later file a written order. Under

these circumstances, the May 13 pronouncement was a final order, and the subsequent filing of a written order does not change that fact. The present case is thereby distinguishable from *Boston* and *Deaton*, and this court has jurisdiction to hear the State's appeals in their entirety. The defendants' motions to dismiss are accordingly denied, and we will next consider the merits of the cases.

### PRESENCE OF INVESTIGATORS IN THE GRAND JURY ROOM

All four defendants contended to the trial court, and the court agreed, that the presence of D.L.E. investigators Covert and Barrett during the reception of testimony from other witnesses by the grand jury denied them due process of law and mandated dismissal of the indictments against them. On January 14, 1982, the State's Attorney moved pursuant to section 112—6(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 112—6(a)) to allow the presence of investigators Covert and Barrett during grand jury proceedings, along with State's Attorney's investigator William J. Kilquist. The record reflects that the D.L.E. agents testified before the grand jury, but that Kilquist did not. It does not show that the investigators questioned any of the witnesses nor that they were present during the deliberations. The due process claim of the defendants is therefore premised upon the presence of grand jury witnesses during the testimony of other witnesses.

Our research has not uncovered authority which precisely answers the question of whether the presence of a person, otherwise authorized to attend grand jury proceedings, becomes unauthorized if that person is called as a witness. In *People v. Arnold* (1910), 248 Ill. 169, 171-72, 93 N.E. 786, 787, our supreme court stated, "The proceedings before a grand jury must be kept strictly secret, and that could not be done if witnesses should be present during the examination of each another. The rule, therefore, is that one witness must never be permitted to be present at the examination of another." The court recognized that this rule was derived from common law; other courts have also so observed. *People v. Minet* (1947), 296 N.Y. 315, 73 N.E.2d 529; *Commonwealth v. Harris* (1919), 231 Mass. 584, 121 N.E. 409; *United States v. Edgerton* (D. Mont. 1897), 80 F. 374.

The common law prohibitions against the simultaneous presence of two or more witnesses in the grand jury room have been relaxed by statute in some States. A California provision containing a plural reference to "witnesses actually under examination" (Cal. Penal Code sec. 939 (Deering)) has been interpreted as authorizing joint examination of grand jury witnesses (*People v. Rojas* (1969), 2 Cal. App. 3d

767, 82 Cal. Rptr. 862) and perhaps also the presence of one witness during the testimony of another witness (*People v. Flores* (1969), 276 Cal. App. 2d 648, 81 Cal. Rptr. 197). A statute in Texas lists as a ground for the dismissal of an indictment the presence of an unauthorized person while the jury was deliberating or voting, as opposed to "investigating a charge." (Tex. Crim. Proc. Code Ann. sec. 27.03 (Vernon).) This enactment has been construed not to prohibit the presence of peace officers and others before the grand jury during the taking of testimony. *Ex parte Rogers* (Tex. Crim. App. 1982), 640 S.W.2d 921.

The relevant provision in Illinois is section 112—6(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 112—6(a)). It states, in part, "Only the State's Attorney, his reporter and any other person authorized by the court or by law may attend the sessions of the Grand Jury. Only the grand jurors shall be present during the deliberations and vote of the Grand Jury." Under this statute, it has been held that the presence of police officers during the investigations of the grand jury did not prejudice the defendant. (*People v. Hunter* (1978), 61 Ill. App. 3d 588, 376 N.E.2d 1065.) It is not apparent from the court's opinion whether the two officers had also been witnesses before the grand jury, because even though the court referred to the presence of the officers during the testimony "of other witnesses," the proceedings at the grand jury were not examined in detail in the opinion. In *People v. Jackson* (1978), 64 Ill. App. 3d 307, 381 N.E.2d 316, it was determined that the presence of an investigator who asked questions of a grand jury witness was concededly erroneous, but did not prejudice the defendant.

The authorities interpreting section 112—6(a) thus do not define the permissible limits of the presence of other parties in the grand jury room. Nonetheless, those authorities are consistent with decisions rendered before the Code of Criminal Procedure of 1963, holding that any unauthorized presence while the grand jury is hearing testimony justifies dismissal of the indictment only if prejudice to the accused is demonstrated. (*People v. Arnold; People v. Munson* (1925), 319 Ill. 596, 150 N.E. 280; *People v. Hartenbower* (1918), 283 Ill. 591, 119 N.E. 605, *dismissed* (1919), 248 U.S. 550, 63 L. Ed. 417, 39 S. Ct. 184.) These cases also indicate that the fact of an indictment alone does not suffice to establish prejudice.

■■ ■ Exclusion of witnesses from grand jury proceedings, as with the exclusion of unauthorized persons in general, is based on the preservation of secrecy in grand jury proceedings. The requirement of secrecy rests upon the following goals: (1) to prevent the flight of the

accused before indictment, (2) to ensure freedom of deliberation by the grand jury, (3) to discourage the use of perjured testimony at trial, (4) to encourage truthful disclosures without coercion, and (5) to protect the innocent and unindicted from unwarranted disclosure. (*People v. French* (1965), 61 Ill. App. 2d 439, 209 N.E.2d 505.) The prevention of coercion is the primary policy behind the secrecy requirement, which is designed to protect defendants who are ultimately indicted. *People v. Hunter*.

The trial court felt that this policy had been violated by the presence of the investigators. In its oral ruling, the court stated that the role of the investigators, especially as witnesses, would have had to have exerted some influence on the deliberations, and essentially left the grand jurors "with no real alternative to returning true bills against these defendants." The court was of the opinion that any coercive effect was enhanced by the fact that the investigators testified both before and after the defendants.

As additional grounds for its ruling, the court indicated that the presence of the investigators violated the secrecy requirement of a grand jury and was improper under the "rule on witnesses." Of course, as we have explained above, the purpose of the secrecy requirement, as concerns these defendants, is to prevent coercion and thus this reason is merely repetitive of the court's fears of possible undue influence. The "rule on witnesses," as the People correctly note, is a common rule of criminal trial practice which favors the exclusion of all witnesses not testifying. Violation of this custom is not reversible error absent an affirmative showing of prejudice. *People v. Leemon* (1977), 66 Ill. 2d 170, 361 N.E.2d 573; *People v. Miller* (1962), 26 Ill. 2d 305, 186 N.E.2d 317; *People v. Jones* (1982), 108 Ill. App. 3d 880, 439 N.E.2d 1011.

█ ▌ Consequently, whether the presence of witnesses in the grand jury while other witnesses are testifying is error or not, this would not provide a reason to dismiss the indictments unless prejudice is demonstrated. A significant component of whether prejudice has occurred is whether those witnesses can be said to have been coercive. In this case, we need not decide if a person authorized to be present in the grand jury room under section 112—6(a) forfeits that authorization if he is to be called as a witness, because the record before us does not prove the existence of prejudice to the defendants.

Agent Covert testified twice before the grand jury. In his first appearance, which was brief, he outlined the areas of investigation which D.L.E. had undertaken. His last appearance set forth the steps which he had taken in attempting to trace the alleged $900 contribu-

tion to Representative Ryan. Agent Barrett only testified before the grand jury to inform them that witness McCarthy desired to change his testimony. We cannot agree that these appearances by the investigators denied the defendants due process.

The defendants do not in any way contend that the agents altered their testimony to contradict their own, nor do they suggest in what way the agents' testimony would have been different had they not been present in the grand jury room. The defendants, particularly defendant Wiggs, maintain that Agent Barrett had a coercive effect on the testimony of Gary McCarthy. This, however, is not borne out by the record. Nowhere was it indicated that Barrett threatened McCarthy or promised him anything to get him to testify a second time. That second appearance did occur after Barrett conversed with McCarthy, but it is not apparent who initiated the conversation. We will not presume the existence of coercion in the absence of any evidence of record showing that it existed. Furthermore, our discussion of the testimony introduced before the grand jury proves that ample evidence was adduced to support the indictments returned by the grand jury. (See *People v. Rojas.*) Any error in allowing Agents Covert and Barrett to remain in the grand jury room therefore could not have prejudiced the defendants. To the extent that the trial court found in this procedure reason to dismiss the indictments, it is reversed. We must next consider the sufficiency of several of the counts of the indictments to allege offenses.

OFFICIAL MISCONDUCT

Count II of the indictment against defendant Toolen alleged that he had committed official misconduct by committing perjury before the grand jury. (Ill. Rev. Stat. 1981, ch. 38, par. 33—3(b).) Pursuant to the defendant's motion, the court dismissed this count, stating that when Toolen testified before the grand jury, he was acting not in his "official capacity," but as any other citizen.

In *People v. Steinmann* (1978), 57 Ill. App. 3d 887, 373 N.E.2d 757, we reviewed many of the decisions under the official misconduct statute, specifically with reference to acts performed by police officers. We concluded that that offense was designed to prevent the exploitation of one's official position by a public officer or employee to the detriment of the public good. It was held that the sale of a gun, lawfully seized by a police officer, was not an act committed in the officer's official capacity.

The defendant in *People v. McGreal* (1971), 4 Ill. App. 3d 312, 278 N.E.2d 504, was a building code inspector for the city of Chicago. He

was charged with official misconduct based upon the fact that, as a witness for the city, he testified falsely under oath that a certain building was in compliance with the building code. No challenge appears to have been made to the sufficiency of the indictment to allege that the defendant was acting in an official capacity, but the court held the indictment sufficient to state the elements of that offense.

In the present case, the defendant argues that he was called before the grand jury in his individual capacity, because the subject of the investigation concerned the delivery of money alleged to have been a campaign contribution. The delivery of this money, he claims, was accomplished, not as the Director of D.A.S., but as a private individual. He concludes that, even if he committed perjury before the grand jury, this could not form the basis for any official misconduct charge against him.

We cannot accept defendant Toolen's position. While the allegedly perjurious testimony given in this case is concededly less directly related to his official capacity than was the testimony in *McGreal*, we do not find a neat separation between Toolen's individual persona and his status as the Director of D.A.S. The testimony presented to the grand jury shows that the money, whether thought of as a contribution never made or a bribe, passed from Allen to Garella to Bauman to Toolen. The use of D.A.S.'s chain of command to channel this money proves that the subject of the grand jury's investigation was not solely a personal matter of Toolen's. His position as Director of D.A.S. was inextricably bound up with the transmittal of the money received from Allen. Consequently, when Toolen testified before the grand jury, he did not do so solely as a private individual. A charge of official misconduct may therefore properly be based on any perjury committed during that investigation. There was some evidence presented to the grand jury, then, to support this charge. See *People v. Rodgers* (1982), 92 Ill. 2d 283, 442 N.E.2d 240.

OBSTRUCTING JUSTICE

Count III of the indictments against both defendant Toolen and defendant Garella charged them with obstructing justice in that they had knowingly furnished false information to the grand jury in order to prevent their own prosecution. (Ill. Rev. Stat. 1981, ch. 38, par. 31—4(a).) In addition, count IV charged Toolen with having furnished false information to D.L.E. investigators. Toolen and Garella argued, and the trial court agreed, that exculpatory denials are excepted from the operation of the Illinois obstructing justice statute (*People v. Brooks* (1977), 51 Ill. App. 3d 800, 367 N.E.2d 236), and

that the charges against them were in fact based on exculpatory denials.

In *Brooks*, the court decided that prosecuting an individual for giving a false denial to police or investigative authorities would reach beyond the purpose of the obstruction of justice statute. That enactment was designed primarily to prevent the misleading of police or other investigators, but was not, as the court observed, intended to punish suspects for failing to confess their involvement in crimes. The court stated that its holding was confined to the situation where the pertinent statements are limited to the suspect's denial of his own wrongdoing, and once a defendant "has voluntarily agreed to make a statement [he] has no privilege to intentionally mislead the police or to withhold information as to the crimes of others which are not inextricably connected with the charge against him." 51 Ill. App. 3d 800, 805, 367 N.E.2d 236, 239.

In the present case, there can be no claim that Toolen and Garella were properly charged with obstruction of justice based upon the acts of others. The argument that Toolen was charged with obstructing the prosecution of Garella and that Garella was charged with obstructing the prosecution of Toolen is belied by the indictments, which refer only to the prosecution of the individual charged with obstructing justice. The question which remains is whether the furnishing of "false information" about the money from Ernest Allen falls into the category of "exculpatory denials" or is something beyond that.

The People argue that under the obstruction of justice statute, as interpreted in *Brooks*, the suspect of a criminal investigation has two permissible options: to remain silent or to deny involvement in any crimes. If he chooses to go beyond that, and in so doing, makes affirmatively false and misleading statements, he has come within the ambit of the obstructing justice statute. We accept this construction of the statute and also agree that it applies in this case.

Defendant Garella did specifically deny accepting money from Wiggs to secure employment for Ernest Allen. But, his testimony did not stop with this denial. Instead, he informed the grand jury that he kept the money at his home for over a year and that he used it to purchase fund raising tickets from Jon Bauman. He went on to specify when, where and how he had purchased the tickets, down to the detail of whether the tickets had stubs which could be used to identify the purchaser. Similarly, defendant Toolen testified at length concerning the procedure which he followed in delivering money and unsold tickets to Representative Ryan's office. The information provided the grand jury by Garella and Toolen, and the information provided

D.L.E. investigators by Toolen thus goes beyond mere exculpatory denials. The provision of that information is accordingly outside the scope of the limited exemption recognized in *Brooks*, and the charged conduct in counts III and IV against Toolen and count III against Garella falls within the prohibitions of the obstruction of justice statute. Our examination of the record before the grand jury reveals the existence of evidence in support of these charges. *People v. Rodgers*.

PERJURY

Count XI of the indictment against defendant Garella charged him with perjury, in that he denied to the grand jury having said to Ernest Allen, "We can beat this \*\*\* thing," in reference to the D.L.E. investigation. The trial court dismissed this count, finding, as a matter of law, that whether or not Garella made that statement was not material to the inquiry of the grand jury. Ill. Rev. Stat. 1981, ch. 38, par. 32—2(a).

■ In order to form the basis of a perjury charge, a statement must, under our perjury statute, be "material to the issue or point in question." Essentially, materiality exists if the allegedly false statement would or could influence the trier of fact in its deliberations on the issues presented to it. (*People v. Mason* (1978), 60 Ill. App. 3d 463, 376 N.E.2d 1059.) The issue of materiality is one of law. *People v. Briddle* (1980), 84 Ill. App. 3d 523, 405 N.E.2d 1357, *cert. denied* (1981), 450 U.S. 986, 67 L. Ed. 2d 823, 101 S. Ct. 1527.

Illustrative of these principles is *People v. Cantrell* (1979), 79 Ill. App. 3d 626, 398 N.E.2d 864. There, the defendant, a police officer, had arrived at the scene of a shooting soon after it occurred. Willie Stokes, an acquaintance of the defendant's, had shot Clarence Torry. The defendant and another officer found Stokes holding a gun, and another gun was on the ground near Torry. An investigation was undertaken concerning the possibility that the gun found near Torry had been planted there.

In preparation for the trial of Stokes on an unrelated offense, Stoke's counsel held a tape recorded interview of the defendant. He asked the defendant whether the gun seen near Torry belonged to the defendant. The defendant replied in the negative. Stokes' attorney then inquired if the gun was "the guy's on the ground," and the defendant responded, "It is now." At the grand jury's investigation into the possible planting of the gun, the defendant admitted having that conversation, but testified, "I did not say nothing about the gun was his now." He was charged with and convicted of perjury based on this statement.

On appeal, the State replied to the defendant's challenge to the sufficiency of this evidence to support a conviction by asserting that the defendant's denial of the "It is now" statement was relevant to the defendant's knowledge of the planting of the gun on Torry. The State argued that that statement could only be interpreted to mean that the defendant knew that the gun did not belong to Torry before the shooting. The court disagreed, finding that this interpretation of the statement was too tenuous to support the defendant's conviction.

■■ Here, too, the State maintains that Garella's denial of the statement mentioned in count XI is material because it reflects a consciousness of guilt. It asserts that, had Garella been innocent, he would have referred to "exoneration" or "vindication," and not to "beating" the investigation. As did the court in *Cantrell*, we find the State's argument too tenuous. We cannot accept that only the guilty refer to "beating" legal proceedings against them, and that the innocent speak only in terms of exoneration. Legal proceedings are burdensome to the parties, and it is unremarkable that a party may refer to these proceedings in derogatory terms, guilty or not. The statement charged in count XI is therefore insufficiently probative of defendant Garella's mental state, and accordingly we affirm the court's dismissal of that count.

THEFT

■■ ■ Count II of the indictment against defendant Wiggs charged him with felony theft. It alleged that "between January 1, 1979 and October, 1980, *** he would bill the State of Illinois, Department of Administrative Services for vehicle parts that were never received [sic] or delivered to the State of Illinois for its use but were instead received [sic] or delivered to employees of the State for their own individual and private use." The indictment was filed on January 29, 1982. The court held that this count did not show, on its face, that any such acts were committed within the period of the statute of limitations, or that the defendant had committed a series of acts which would result in the statute of limitations commencing with the last act. Ill. Rev. Stat. 1981, ch. 38, pars. 3—5(b), 3—8.

It is axiomatic that an indictment which does not show that the offense was committed within the appropriate limitations period must aver facts which bring the indictment within one of the exceptions to the general period of limitations. (*People v. Strait* (1978), 72 Ill. 2d 503, 381 N.E.2d 692.) The only statutory exception which could apply to the defendant's conduct is that which arises "[w]hen an offense is based on a series of acts performed at different times." (Ill. Rev.

Stat. 1981, ch. 38, par. 3—8.) The question presented here is what facts must be alleged to state that a series of acts has occurred.

In *People v. Curoe* (1981), 97 Ill. App. 3d 258, 422 N.E.2d 931, the indictment was held sufficient to establish that the defendant's exertion of unauthorized control over the assets of an estate was a series of acts, the last of which, and therefore the entire series, was within the statute of limitations. It appears from the court's opinion that the indictment contained the date of the last of these acts. Such is not the case here. Nor has the State specifically alleged that Wiggs' acts constituted a series, in those words. The People respond that by the indictment's use of the subjunctive "he would bill," this count strongly suggests that a pattern of billing, instead of one act, existed. While one may read this language that way, this does not cure the problem with this count of the indictment.

Simply put, even if we accept the State's position that a series of acts occurred in this case, nothing in the indictment indicates when the last of those events took place. The indictment alleges only that the criminal conduct happened "between January 1, 1979 and October, 1980." But the first month of that period was beyond the statute of limitations, and no facts in the indictment establish that the last of any series of acts occurred later than that first month. Had the State alleged facts to show that fraudulent billing occurred at a time within the limitation period, we would agree with the State that the entire indictment would be within the statute of limitations. The State's failure to allege facts giving rise to the exception for a series of acts, however, renders the indictment insufficient to charge an offense. *People v. Munoz* (1974), 23 Ill. App. 3d 306, 319 N.E.2d 98.

The People request, as alternative relief, that it we find section 3—8 inapplicable to this count, we should "specify that only the thefts occurring prior to January 29, 1979, are barred." Not only is no authority provided for this procedure in the State's brief, but there is a practical problem with this solution, as defendant Wiggs points out. The indictment does not specify the amount of the items billed fraudulently after January 29, 1979, and thus we cannot determine if the appropriate limitations period for the remaining transactions would be the general felony period or the general misdemeanor period. (Ill. Rev. Stat. 1981, ch. 38, par. 3—5(b).) Consequently, we must affirm the trial court's dismissal of the entirety of count II against defendant Wiggs.

FORGERY

■■ ■ The final issue in this appeal is the sufficiency of the for-

gery indictments against defendant Wiggs. Count III of that indictment alleged that Wiggs "with the intent to defraud, *** knowingly made or altered a document apparently capable of defrauding another, in that it purported to have been made by authority of one who did not give such authority, said document being a Transcript of Telephone Quotation requisition number 174 setting forth bids for vehicle parts and dated January 30, 1979." Counts IV through VII of the indictment were almost identical to count III, except that each count alleged a different requisition number and date. The requisition forms were not attached to the counts of the indictment. The trial court granted the defendant's motion to dismiss all five of these counts, stating "I don't think that the phrase 'transcript of telephone quotations' shows anything, that it has any common meaning as 'a document capable of defrauding another.' I don't think these charges are specific enough."

It is an element of the offense of forgery that the document made or altered be apparently capable of defrauding another. (*People v. Moats* (1972), 8 Ill. App. 3d 944, 291 N.E.2d 285.) Such a document "includes, but is not limited to, one by which any right, obligation or power with reference to any person or property may be created, transferred, altered or terminated." (Ill. Rev. Stat. 1981, ch. 38, par. 17—3(c).) An indictment for forgery no longer need include a copy of the document or set it forth *in haec verba*, but may instead give a description of the pertinent instrument. (*People ex rel. Miller v. Pate* (1969), 42 Ill. 2d 283, 246 N.E.2d 225.) The indictment found sufficient in *Miller* alleged that the defendant had altered a stock certificate representing five shares so that it appeared to be in the amount of 5,000 shares, which certificate was delivered as collateral for a loan.

The problem that the trial court found with these counts of the indictment was not that they failed to specify how the documents were altered, for they alleged that the documents purported to have been made by the authority of one that had not actually given such authority. (Compare *People v. Young* (1974), 19 Ill. App. 3d 455, 311 N.E.2d 609.) To the court, the difficulty was that the indictment did not specify how the altered instrument might defraud anyone.

In *People v. Moats, People v. Gilmore* (1975), 28 Ill. App. 3d 130, 328 N.E.2d 53, and *People v. Holloman* (1975), 30 Ill. App. 3d 822, 333 N.E.2d 509, the appellate court held that indictments which referred to negotiable instruments, facially insufficient due to the absence of a party or an amount, did not charge the offense of forgery. These cases enunciated the rule that if an instrument which is the

subject of a forgery charge does not show on its face an apparent capacity to defraud another, then the indictment must include facts which establish that capacity. *Gilmore* and *Holloman* were reversed by the supreme court (*People v. Gilmore* (1976), 63 Ill. 2d 23, 344 N.E.2d 456), which stated that the test for ascertaining the sufficiency of an indictment attacked for the first time on appeal is whether it apprised the accused of the precise offense charged with sufficient specificity to allow him to prepare his defense or to plead a conviction as a bar to future prosecutions arising from the same conduct. Presumably the *Moats* indictment, also first challenged on appeal, would have been insufficient under *Gilmore*. See also *People v. Moyer* (1971), 1 Ill. App. 3d 245, 273 N.E.2d 210.

The supreme court declined to address the question of whether the *Gilmore* and *Holloman* indictments would have been sufficient to withstand a motion to quash them or what standard should be applied where, as here, forgery indictments are challenged prior to trial. Generally, in order to withstand a motion to quash or dismiss, an indictment must allege, *inter alia,* "the nature and elements of the offense charged." (Ill. Rev. Stat. 1981, ch. 38, par. 111—3(a)(3); *People v. Rose* (1976), 44 Ill. App. 3d 333, 357 N.E.2d 1342.) This court has interpreted this provision in a case prior to *Gilmore* to require that the document be facially capable of defrauding another or that the indictment aver facts showing that capacity. (*People v. Dismore* (1975), 33 Ill. App. 3d 495, 342 N.E.2d 151.) This statement has been recently reaffirmed in *People v. Reynolds* (1980), 85 Ill. App. 3d 549, 407 N.E.2d 64, although in neither *Dismore* or *Reynolds* were the indictments challenged at trial. Nonetheless, we agree with the reasoning in *Dismore* that an indictment for forgery should allege facts to establish the document's capacity to defraud, if it is not apparent that the document would do so. The capacity to defraud is explicitly mentioned in the forgery statute in such a way as to show that that capacity is part of the nature and elements of that offense. Consequently, where, as here, a forgery indictment is challenged by a motion to quash or dismiss, that indictment must meet the standards set forth in *Dismore.*

We agree with the State that the forgery indictments against Wiggs are sufficient under those standards. In finding that those indictments did not state offenses, the trial court examined the language "transcript of telephone quotations" and found that these were not necessarily documents capable of defrauding another. However, the forgery indictments went beyond reference only to transcripts of telephone quotations. They also referred to these documents as "req-

uisitions," which set "forth bids for vehicles parts." While a transcript of a telephone quotation, itself, does not give rise to the inference that that transcript had the capacity to defraud anyone, the remaining language in the indictment supplies that information. A requisition is commonly understood to be a written request for supplies, and a bid for vehicle parts is simply an offer to furnish those parts at a specified price. The forgery indictments plainly state, then, that the documents made or altered were requests for auto parts which contained offers to supply those parts at a specified price when, in fact, no authority to make those offers existed.

When this definition of the documents contained in the indictments is considered, we believe that the capacity to defraud has been alleged. If auto parts are requested on a form which includes bids for which no authority has been given, action could be taken on that form which might not have been taken in the absence of the unauthorized bids. In the language of the statute, a right, obligation or power with reference to any person or property, namely the right to purchase vehicle parts from an offeror at a specified price, could be created, transferred, altered or terminated by the requisition forms. (Ill. Rev. Stat. 1981, ch. 38, par. 17—3(c).) While the specifics of the bid procedures could have assisted in explaining the capacity of the requisition forms to defraud, this information is not necessary. It should be remembered that an indictment, as a preliminary proceeding, should contain no more than a cursory statement of the facts informing a defendant of the charge. (*People v. Rose.*) Requiring further explanation in the forgery indictments would serve no purpose, inasmuch as we have found that they allege the capacity of the requisition forms to defraud. The trial court's dismissal of those indictments must be reversed.

CONCLUSION

For the foregoing reasons, we affirm the trial court's dismissal of count XI against defendant Garella and count II against defendant Wiggs. The dismissal of the remaining counts against all defendants is reversed and these causes are remanded to the circuit court of Jackson County.

Affirmed in part, reversed in part, and remanded.

HARRISON, P.J., and KASSERMAN, J., concur.