NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 231067-U

NOS. 4-23-1067, 4-24-0753 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 5, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellant and Cross-Appellee, | ) | Circuit Court of |
| v. | ) | Rock Island County |
| MARCUS NORTHERN, | ) | No. 08CF1150 |
| Defendant-Appellee and Cross-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Richard A. Zimmer, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE HARRIS delivered the judgment of the court.
Justice Grischow concurred in the judgment.
Justice Cavanagh concurred in part and dissented in part.

**ORDER**

¶ 1    *Held*: The trial court did not err in its ruling on defendant's postconviction petition following a third-stage evidentiary hearing.

¶ 2    Defendant, Marcus Northern, filed a petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)). Following a third-stage evidentiary hearing, the trial court granted the petition based on defendant's claim that his trial counsel was ineffective for failing to investigate and call alibi witnesses in his defense. The State appeals (appeal No. 4-23-1067), arguing the court's decision was manifestly erroneous because defendant's counsel made decisions based on sound trial strategy and defendant suffered no prejudice. Defendant also appeals (appeal No. 4-24-0753), arguing the court erred by denying his additional postconviction claims related to alleged improper grand jury proceedings and the admission of prejudicial gang affiliation evidence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            In November 2008, defendant was charged by indictment with two counts of first

degree murder (720 ILCS 5/9-1(a)(2), (a)(3) (West 1998)) in connection with the January 1999

stabbing death of Robert Blanks. Prior to his indictment, the grand jury investigating the matter

met numerous times from January through November 2008. Detective Douglas Garrison of the

Moline Police Department was present at all but one of the grand jury's sessions. On January 30,

2008, the grand jury met, and Garrison testified he had "been previously appointed as the Grand

Jury Investigator in this case." While the record suggests there were grand jury proceedings prior

to January 30, 2008, it does not contain transcripts of those earlier proceedings. During the various

grand jury sessions, Garrison, at times, directly questioned witnesses, informed the grand jury what

was "important," and was delegated the "responsibility" by the state's attorney to "sort of educate

the grand jury."

¶ 5            In February 2009, defendant appeared before the trial court and requested the grand

jury transcripts as part of discovery. In October 2009, just prior to trial, he again appeared before

the court and indicated he was not ready for trial. Defendant expressed concerns about a witness

not being called, not receiving certain parts of discovery, and not speaking directly with the

court-appointed investigator for his case. Regarding the witness, defendant's trial counsel stated

he believed it was "not to [defendant's] benefit to bring him up here." The court informed

defendant it was his choice whether to testify, but it was his counsel's decision about which

witnesses to strategically call. The court informed defendant he was not entitled to all discovery

documents while in custody because the documents could end up being passed around the jail.

Regarding the investigator, counsel informed the court he had not utilized the investigator. The

court told defendant it had conducted a previous trial against a codefendant for Blanks's murder.

The court suggested the investigator's services may not be needed because the same witnesses from that trial would be locked into their statements for defendant's pending trial. The matter proceeded to a jury trial on October 19, 2009.

¶ 6                                     A. Jury Trial and Posttrial Proceedings

¶ 7            At trial, Zeneta Jones testified she was at home with her three children, whom she shared with Blanks. According to Zeneta, Blanks sold cocaine for money. On January 10, 1999, Blanks arrived home at approximately 10 p.m. Zeneta was asleep and awoke to a man holding a gun to her head. She observed two other men in the room as well, one of whom was holding a knife to her side. She described all the men as wearing masks and hooded sweatshirts. Zeneta was told to summon Blanks, who was in the bathroom taking a shower. When Zeneta called for Blanks, the men rushed into the bathroom and attacked Blanks. Zeneta ran next door to where her mother lived. While running, she realized she had been stabbed. She also noticed Blanks standing on the porch of their home naked. Blanks proceeded to Zeneta's mother's home, where he fell to the floor. Zeneta observed that Blanks had been stabbed several times. Evidence showed that although Zeneta could not identify any of the men, she reported to the police that she recognized one of the men's voices as belonging to Van Williams, whose "street name was Tazz."

¶ 8            Paramedic James Versluis testified that when he arrived at the scene, Blanks was already dead. Versluis treated Zeneta for a stab wound to her abdomen.

¶ 9            Officer Steve Wilson spoke with Zeneta at the hospital about recognizing Williams's voice. Zeneta told Wilson that Williams and Blanks had recently been arguing.

¶ 10           Pathologist Larry Blum testified Blanks had suffered 30 to 32 stab wounds, one of which severed his aorta, causing his death.

¶ 11           Leslie Masengarb testified she lived with defendant's cousin. She recalled driving

defendant to a hospital in nearby Davenport, Iowa, one night in 1999. She was unaware why defendant needed her to drive him to the hospital but noticed blood on the passenger seat after he exited her vehicle.

¶ 12        Driesst McAdams, a nurse at Genesis Medical Center in Davenport, stated she treated a patient named "Steve Callaway" in the emergency room at approximately 2:34 a.m. on January 11, 1999. It was later learned that defendant had given a false name when he was treated at the hospital. She observed a serious wound on defendant's left hip. She was told the wound occurred because defendant fell on a sharp metal object. She believed it was a stab wound. Defendant eventually refused treatment and requested to leave. When signing a release form, McAdams observed defendant begin to write his first name, then stop, look at his wristband, state he made a mistake, and write "Steve Callaway."

¶ 13        Dr. Christopher Posey treated defendant at the hospital. Posey opined the wound appeared to be a stab wound. Posey contacted the police because he was suspicious "something else was going on." Posey obtained a second opinion from a trauma surgeon, who also agreed the wound was a stab wound.

¶ 14        Police officer Maureen Hammes arrived at the hospital and spoke with defendant. When she asked him for identification, defendant responded he did not have any. Hammes transported defendant to the police station, where several officers identified him. Defendant later admitted his identity and that he was not Steve Callaway.

¶ 15        Christopher McAfee testified he had been convicted of homicide in 1992 and possession with intent to deliver marijuana in 2005, and he was currently incarcerated for a 2008 offense. McAfee stated he was close friends with defendant, they grew up together, and they were members of the same gang. In 2005, a fellow gang member, Robert Johnson, was arrested.

Defendant told McAfee he was concerned Johnson was a "weak link" and that federal agents would pressure him about Blanks's murder. McAfee believed defendant and/or Johnson were involved in the murder. On cross-examination, McAfee admitted he and defendant were no longer close friends after defendant slept with the mother of McAfee's children.

¶ 16 Cordney Smith testified he was incarcerated for drug conspiracy. Smith was friends with Blanks, and they were both members of a rival gang of defendant. Smith stated, a few months prior to Blanks's murder, he and Blanks were sitting outside Blanks's mother's home when defendant, Johnson, and two or three other men walked by. Smith believed the men were "casing the spot out" and "thought something was going to happen." In 2000, Smith encountered defendant outside a nightclub, where defendant said, " 'You Disciples ain't put enough work in. You all didn't put enough work in, you all need to get your murder game up to par.' " Smith interpreted defendant's statement to mean that defendant had murdered Blanks. Smith stated he was testifying pursuant to an agreement that might reduce his prison time.

¶ 17 Sean Lewis testified he was incarcerated and hoped to gain leniency. In January 1999, he was living in Memphis, Tennessee, hiding from the police when he learned Blanks had been killed. Defendant contacted Lewis, seeking a place to stay. Lewis sent defendant a bus ticket, and defendant lived with Lewis in Memphis. Defendant told Lewis he, Johnson, and Perry Slater went to Blanks's house to rob him. Defendant had a knife and Johnson had a handgun. Defendant stated they caught Blanks coming out of the shower and "the whole robbery went haywire." Defendant stated he was wounded during the attack and that Blanks was killed. Lewis testified Blanks lived with his wife, Zeneta, and children at a home next door to Blanks's mother-in-law. On cross-examination, Lewis admitted he had been incarcerated with Slater in 2005, and Slater had informed him about the murder as well. Lewis was surprised to learn defendant had pleaded

guilty to a criminal offense in Scott County, Iowa, in February 1999. Lewis believed defendant was living in Memphis in February 1999. Lewis was also unaware defendant was in prison in April 2000 because he believed defendant was still living in his home in Memphis after Lewis had been incarcerated in March 1999.

¶ 18　　　The State attempted to call defendant's former girlfriend, Chrystal Brooks, as a witness to corroborate Lewis's testimony that defendant was in Memphis after the murder. Defendant objected, and the State provided an offer of proof of Brooks's testimony. Ultimately, the trial court ruled the State could not call Brooks to the stand, noting her testimony was contradictory to Lewis's testimony and failed to establish that defendant was ever in Memphis.

¶ 19　　　Lewis testified again on defendant's behalf. Lewis admitted defendant never told him he had stabbed Blanks. Lewis stated defendant gave him " 'semi scenarios,' " and after speaking with other friends, Lewis " 'put two and two together.' "

¶ 20　　　Police officer Douglas Garrison was called to testify by defendant. He testified that, while investigating Blanks's murder, he failed to find any witnesses who saw defendant in Memphis with Lewis. Garrison also failed to discover any physical evidence showing that defendant ever resided in Memphis.

¶ 21　　　The jury returned guilty verdicts on both counts.

¶ 22　　　Defendant subsequently filed a *pro se* motion requesting a new trial because his trial counsel was ineffective for, *inter alia*, failing to investigate an alibi defense or call alibi witnesses. No specific alibi witnesses were named in the motion.

¶ 23　　　Defendant, with new counsel, filed a motion for a new trial and alleged his trial counsel was ineffective for failing to call several witnesses, including Belinda Jones, Chrystal Brooks, Yolanda Morrow, and Tonya Morrow. An affidavit from defendant, attached to the

motion, stated his trial counsel failed to contact alibi witnesses Margie Northern and Yolanda Morrow.

¶ 24 At the hearing on defendant's motion, defendant's counsel pursued only the claim that defendant's trial counsel, Herbert Schultz Jr., was ineffective for failing to call Jones and Brooks as witnesses at trial. Defendant called Schultz as a witness, and he testified he had secured a court-appointed investigator for defendant's case but did not have the investigator interview anyone. He recalled Jones's statement in discovery that she had observed someone known as "the furniture man" in Blanks's home going through Blanks's clothes after he had been attacked. Schultz did not interview Jones personally and believed her statement was not important. Schultz also declined to call Brooks because, when he interviewed her, she was "all over the map." Additionally, defendant told Schultz there was "bad blood" between him and Brooks, so Schultz did not trust her testimony. Schultz confirmed his trial strategy was predicated on the weakness of the State's evidence.

¶ 25 On cross-examination by the State, Schultz denied that defendant ever mentioned Yolanda Morrow or Tonya Morrow as alibi witnesses. When asked if defendant had "mention[ed] any other people" as alibi witnesses, Schultz stated, "No." When asked if there were any strategic reasons why Schultz did not call any alibi witnesses, he said defendant "didn't have any."

¶ 26 The trial court denied defendant's motion, finding trial counsel had strategic reasons for not calling Jones or Brooks as witnesses on defendant's behalf.

¶ 27 In March 2011, defendant was sentenced to 60 years' imprisonment.

¶ 28 B. Direct Appeal and Postconviction Proceedings

¶ 29 Defendant filed a direct appeal, arguing (1) the evidence was insufficient to prove his guilt beyond a reasonable doubt, (2) his trial counsel was ineffective for failing to call witnesses

Jones and Brooks, and (3) his sentence was excessive. *People v. Northern*, 2013 IL App (3d) 110231-U, ¶ 1. The appellate court affirmed. *Id.* ¶ 48.

¶ 30　　　　In March 2014, defendant filed a *pro se* postconviction petition pursuant to the Act. The petition alleged, *inter alia*, that (1) alibi witnesses Margie Northern and Yolanda Morrow would have testified to his whereabouts on the evening of Blanks's murder, (2) trial counsel was ineffective for failing to move to dismiss the indictment because Garrison was permitted to question several witnesses during the grand jury proceedings, and (3) counsel was also ineffective for failing to object to prejudicial gang evidence.

¶ 31　　　　The matter languished for several years while defendant was appointed several different postconviction counsel. Finally, in March 2022, defendant's fourth appointed postconviction counsel filed a second amended petition, alleging that Schultz was ineffective for failing to (1) call alibi witnesses Margie Northern, Yolanda Morrow, and Tonya Morrow, (2) challenge the improperly conducted grand jury proceedings, and (3) challenge the admission of prejudicial gang evidence. Defendant also alleged his appellate counsel was ineffective for failing to raise Schultz's ineffectiveness as to those issues on direct appeal. Affidavits from both Margie and Yolanda were attached to the petition.

¶ 32　　　　In her affidavit, Margie averred that she was with defendant at Yolanda's residence on the night of the murder. She stated defendant arrived at the residence around 8 p.m. and left around 12:30 a.m. to go to Tonya's residence. Margie asserted she tried to contact Schultz, defendant's trial counsel, "multiple times" but "never received a call back." Although she was never interviewed by Schultz, he did advise her on the first day of defendant's trial that she could not enter the courtroom because she was going to be called as a witness. Margie maintained she was present for every day of defendant's trial but was never called to testify.

¶ 33　　　　Yolanda averred that defendant arrived at her residence around 7:45 p.m. on the night of Blanks's murder and remained there with her and Margie until 12:30 to 12:45 a.m. After being informed of the charges against defendant, Yolanda attempted to contact Schultz "on numerous occasions." She left messages informing him of the information she had. Yolanda maintained that Schultz never returned any of her calls or messages. Further, she stated that she would have been "happy to testify" on defendant's behalf at trial.

¶ 34　　　　In May 2023, the trial court conducted an evidentiary hearing on defendant's petition. With respect to his alibi witness claim, defendant testified on his own behalf, asserting that he had informed Schulz of his alibi witnesses—Margie, Tonya, and Yolanda. He testified Margie and Tonya were his sisters and Yolanda was his cousin. According to defendant, Schultz responded by telling defendant that the State had a weak case and that he did not believe a defense was necessary. Defendant stated that he and Schultz also discussed hiring a private investigator. Further, he noted that prior to trial, he complained to the trial court that the defense investigator "the judge signed off on" was not being used.

¶ 35　　　　Defendant testified that on the night of the murder, he was at Yolanda's residence, arriving between 7:30 p.m. and 8 p.m. He left around 12:30 a.m. to return to his sister Tonya's residence, where he had been staying. At Tonya's residence, he slipped on some snow and fell onto a broken porch railing, injuring his abdomen on a piece of metal. He went to the hospital at approximately 2:30 a.m. Defendant stated that Tonya passed away in 2003, prior to his indictment in 2008. Tonya's death certificate was admitted into evidence at the hearing.

¶ 36　　　　Margie testified at the evidentiary hearing that defendant was her brother. On the evening of Blanks's murder, she was with defendant and Yolanda from 8 or 9 p.m. until 12:30 a.m. With respect to defendant's trial, Margie asserted that she had tried to communicate with

Schultz "about alibi information." She stated that she tried to call Shultz's office "a few times" and left messages but never received a response. Margie stated she also attended defendant's trial but was told by Schultz that she could not be in the courtroom because she would be called as a witness. At that time, she did not tell Schultz that she had alibi information, stating she "just assumed that's why [she] had to wait in the hallway." On cross-examination, Margie acknowledged that she never approached the police "or anybody like that" to tell them about defendant's alibi information, stating, "[T]hat's what [defendant's] lawyer is for."

¶ 37    Schultz, defendant's trial attorney, was not called as a witness to testify at the evidentiary hearing.

¶ 38    In October 2023, the parties convened for the trial court's ruling on defendant's petition. Relevant to these appeals, the court denied defendant's claims as to the grand jury proceedings and gang evidence. It found Garrison's conduct at the grand jury proceedings did not rise to the level of a substantial deprivation of a constitutional right, "even if contrary to statutory requirements, grand jury rules, et cetera." The court noted the standard for an indictment was significantly less than the standard for defendant's ultimate conviction by a jury. Further, had Schultz challenged the indictment, the State would have been permitted to seek a second indictment by correcting the error, thereby resulting in no prejudice to defendant. Because defendant was not prejudiced by the purported grand jury issues, the court concluded appellate counsel was also not ineffective for failing to raise the issue on direct appeal.

¶ 39    Addressing the gang affiliation evidence, the trial court stated there was no evidence showing Schultz was ineffective, "much less that it prejudiced [defendant]." For the same reasons, the court concluded appellate counsel could not be ineffective for failing to raise the issue on direct appeal.

¶ 40 However, the trial court agreed with defendant with respect to his claim that Schultz was ineffective for failing to investigate and call defendant's alleged alibi witnesses. The court cited *People v. King*, 316 Ill. App. 3d 901 (2000), as analogous. It also noted that Shultz did not testify at the evidentiary hearing and that it did not "have anything from him to determine what his trial strategy was or his reasoning." The court emphasized that there appeared to be "no investigation done upon which *** Schultz could have *** made an informed decision." It pointed to defendant's testimony that he informed Schultz "about the alibi" and the names of his witnesses and that Schultz responded by stating the State's case was weak and that defendant did not need an alibi defense. Further, the court noted that defendant's testimony regarding his complaints about Schultz's failure to use the defense investigator was supported by the record. The court pointed to pretrial transcripts that showed defendant informed the trial judge that he did not agree with Schultz's "strategy" and that he complained that the court-appointed defense investigator had not spoken to anyone "on the case." The court also relied on the special concurrence in defendant's direct appeal, which noted the lack of direct evidence implicating defendant and the weakness of the circumstantial evidence in the case. See *Northern*, 2013 IL App (3d) 110231-U, ¶¶ 49-55 (McDade, J., specially concurring).

¶ 41 The trial court concluded that Schultz's "failure to interview and call" defendant's alibi witnesses amounted to deficient performance. Additionally, given the weakness of the State's case, it found defendant suffered prejudice. The court granted defendant's postconviction petition based on his alibi witness claim, ordering his conviction vacated and the matter set for a new trial.

¶ 42 These appeals followed.

¶ 43                                    II. ANALYSIS

¶ 44 The State appeals, contending the trial court erred when granting defendant's

petition because Schultz's decision not to interview or call alleged alibi witnesses (1) was sound trial strategy and (2) did not prejudice defendant. Defendant also appeals, challenging the court's denial of his claims relating to the alleged improper grand jury proceedings and the admission of gang-related evidence at trial. Specifically, he argues (1) the court erred when finding Garrison's participation in the grand jury proceedings was not prejudicial, (2) Schultz was ineffective for failing to seek a dismissal of the indictment, (3) Schultz was ineffective for failing to object to prejudicial gang evidence, and (4) his counsel on direct appeal was ineffective for failing to raise the issue of prejudicial gang evidence.

¶ 45      The Act provides a three-stage process to remedy a defendant's conviction that resulted from a substantial violation of their constitutional rights. *People v. Edwards*, 197 Ill. 2d 239, 243-44 (2001). When a petition advances to the third stage of postconviction proceedings, the trial court conducts an evidentiary hearing, during which the defendant bears the burden of proving a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 472-73 (2006). At the third-stage hearing, "the circuit court serves as the fact finder, and, therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *People v. Domagala*, 2013 IL 113688, ¶ 34.

¶ 46      On review, the trial court's third-stage factual findings and credibility determinations are entitled to significant deference on review. Specifically, "[a]fter [a postconviction] evidentiary hearing where fact-finding and credibility determinations are involved, the circuit court's decision will not be reversed unless it is manifestly erroneous." *People v. English*, 2013 IL 112890, ¶ 23. "Manifest error is clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People v. Coleman*, 2013 IL 113307, ¶ 98. "Thus, a decision is manifestly erroneous when the opposite conclusion is clearly evident." *Id.* "This deferential

standard of review reflects the understanding that the trial court is in the best position to observe and weigh the credibility of the witnesses." *People v. House*, 2023 IL App (4th) 220891, ¶ 78.

¶ 47 Our supreme court has also stated that where no fact-finding and credibility determinations are necessary at a third-stage hearing and the issues presented involve only questions of law, a *de novo* standard of review may be applied. *English*, 2013 IL 112890, ¶ 23. In the postconviction context, this court has further held that because review of ineffective-assistance-of-counsel claims typically involves a mixed question of law and fact, a hybrid standard of review applies. See *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 55 (citing *People v. Coleman*, 2015 IL App (4th) 131045, ¶ 66). In particular, "[w]hen addressing such a claim, we defer to the trial court's factual findings and will disturb them only if they are against the manifest weight of the evidence but review *de novo* the court's ultimate determination of whether counsel rendered ineffective assistance." *Id.*

¶ 48 To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test from *Strickland v. Washington*, 466 U.S. 668 (1984). Specifically, "a defendant must prove that defense counsel's performance fell below an objective standard of reasonableness and that this substandard performance created a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *People v. Graham*, 206 Ill. 2d 465, 476 (2003). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *People v. Hale*, 2013 IL 113140, ¶ 18 (quoting *Strickland*, 466 U.S. at 694).

¶ 49 A. The State's Appeal—Alibi Witnesses

¶ 50 1. *Schultz's Prior Testimony*

¶ 51 As noted, the State argues the trial court erred by granting defendant postconviction

relief based on his claim that Schultz was ineffective for failing to interview or call defendant's alleged alibi witnesses. Initially, it contends Schultz exercised sound trial strategy in not calling alibi witnesses and points to testimony that Schultz gave in August 2010 at a posttrial hearing that defendant did not inform Schultz of any alibi witnesses. The State maintains Schultz strategically did not call any alibi witnesses because the record shows defendant did not have any. However, we decline to consider evidence of Schultz's August 2010 testimony, as it was not presented to, or considered by, the court at the 2023 third-stage evidentiary hearing.

¶ 52    Again, the trial court serves as the fact finder at a third-stage evidentiary hearing and, as a result, "it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *Domagala*, 2013 IL 113688, ¶ 34. "At [the third] stage, the circuit court must determine whether the evidence introduced demonstrates that the petitioner is, in fact, entitled to relief." *Id.* "The court may receive proof by affidavits, depositions, oral testimony, or other evidence." 725 ILCS 5/122-6 (West 2022). Further, although the court may properly refer to the entire record in the case before it during a postconviction evidentiary hearing (*id.* § 122-2.1(C)), it has no obligation to do so. See *People v. Thomas*, 20 Ill. 2d 603, 608 (1960) ("[A]lthough it would have been proper for the judge [at the postconviction evidentiary hearing] to refer to the evidence at the original trial, he was not required to do so, and his failure to read the evidence did not constitute prejudicial error.").

¶ 53    Here, the State relies on Schultz's 2010 testimony for the first time on appeal. Schultz's prior testimony was not presented during the underlying postconviction proceedings, either through evidence or argument. It was not even mentioned at the hearing or in the trial court's ruling. Rather, at the May 2023 third-stage evidentiary hearing, the State's argument assumed that defendant *did* inform Schultz of the alibi witnesses and that Schultz simply elected, based on

- 14 -

reasonable and sound trial strategy, not to present them. While Schultz's 2010 testimony was within the underlying record, the trial court was entitled to confine its consideration to the evidence and argument submitted to it by the parties at the postconviction evidentiary hearing. It was under no obligation, statutory or otherwise, to search the record for evidence that either contradicted defendant's claim of error or supported a responding argument—an argument, we must emphasize, that the State *never actually advanced* in the trial court. Our consideration of such evidence at this stage of the proceedings would place just such an obligation on the trial court.

¶ 54 Significantly, Schultz's 2010 testimony is also not the type of evidence that could positively rebut defendant's postconviction alibi witness claim. "For *** evidence to be positively rebutted, it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." (Internal quotation marks omitted.) *People v. Gharrett*, 2022 IL App (4th) 210349, ¶ 42. Rather than being conclusive of the issue defendant raised in his postconviction petition, Schultz's prior testimony is simply contradictory to defendant's position. *People v. Robinson*, 2020 IL 123849, ¶ 60 ("[T]he existence of a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted."); *People v. Moore*, 2022 IL App (1st) 192290, ¶ 44 (stating eyewitness testimony "generally fails to meet the requirements for a positive rebuttal"). Thus, evidence of Schultz's testimony from the prior posttrial hearing is the type of evidence that should be weighed by the trier of fact when resolving the issues in the case. At a third-stage evidentiary hearing, the trial court is the trier of fact. Consideration of Schultz's 2010 testimony in the manner suggested by the State would require this court to step into the shoes of the trial court as the trier of fact and weigh conflicting evidence, including evidence not presented or considered at the evidentiary hearing. Such is not the function of this court on review.

¶ 55　　　　An additional problem with the State's request is that "[a] reviewing court *may only affirm* on any basis in the record; it may not reverse on any grounds found in the record." (Emphasis in original.) *People ex rel. Department of Human Rights v. Oakridge Healthcare Center, LLC*, 2020 IL 124753, ¶ 36. In *Oakridge Healthcare*, a party sought reversal of a trial court's judgment by raising an argument that the party had failed to raise with the trial court and arguing that the reviewing court could affirm or reverse on any ground appearing in the record. *Id.* ¶¶ 35-36. The supreme court rejected that contention, finding it "reflect[ed] a misunderstanding of the applicable standard." *Id.* ¶ 36. Similar circumstances are presented here, where the State seeks reversal of the trial court's judgment based on evidence and argument that was never presented to, or considered by, the lower court. Accordingly, we reject the State's argument and do not consider Schultz's 2010 testimony in addressing the merits of the State's appeal.

¶ 56　　　　Additionally, contrary to the State's argument on appeal, we find that evidence showing Schultz was unaware of, or never informed of, defendant's alleged alibi witnesses would not establish that Schultz exercised any sound trial strategy by failing to call them. Rather, such evidence would have provided a separate basis upon which to reject defendant's ineffective-assistance claim. Notably, a defendant's attorney may be deemed ineffective for failing "to present exculpatory evidence *of which he is aware*, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense." (Emphasis added.) *King*, 316 Ill. App. 3d at 913. Whether defendant informed Schultz of the existence of his alleged alibi and alibi witnesses prior to trial presents a distinct issue from whether Schultz made knowing, tactical decisions not to present such alibi witness testimony. In other words, counsel does not *decide* to forgo calling a witness of whom he is unaware. At the evidentiary hearing, the State relied solely on the contention that Schultz made a sound, strategic decision not to call alibi witnesses. As stated,

such an argument assumes Schultz's knowledge of those witnesses and their alleged alibi testimony.

¶ 57                    2. *Schultz's Failure to Interview or Call Alibi Witnesses*

¶ 58          As set forth above, the State argues the trial court erred in finding ineffective assistance based on Schultz's failure to interview or call defendant's alleged alibi witnesses. The State begins by noting that Tonya Morrow passed away in 2003 and defendant was not indicted until several years later; therefore, Schultz could not have elicited Tonya's testimony as an alibi witness. As to the remaining two alibi witnesses—Margie Northern and Yolanda Morrow—the State points out that both were defendant's family members. It maintains that, as such, the witnesses lacked credibility and their testimony would not have overcome the evidence of defendant's guilt that was presented at trial.

¶ 59          In the context of an ineffective-assistance-of-counsel claim, "strategic choices made by defense counsel after a thorough investigation of the law and facts relevant to the plausible options are virtually unchallengeable." (Internal quotation marks omitted.) *Id.* Generally, "trial counsel's decision whether to present a particular witness is within the realm of strategic choices that are generally not subject to attack on the grounds of ineffectiveness of counsel." *Id.* However, counsel may be deemed ineffective for the "failure to present exculpatory evidence of which [counsel] is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense." *Id.*

¶ 60          Here, the record reflects findings by the trial court that (1) defendant informed Schultz that he had an alibi and provided the names of his alibi witnesses and (2) Schultz failed to investigate defendant's reported alibi defense. As noted by the court, Schultz did not testify at the evidentiary hearing. Therefore, the trial court did not know "what his trial strategy was or his

reasoning." Also, defendant testified that he had informed Schultz that he had an alibi and provided the names of his alibi witnesses. The court pointed out defendant's testimony that Schultz responded that defendant did not need an alibi defense because the State's case was weak. It also relied on testimony from defendant that he had complained about Schultz's failure to use the court-appointed defense investigator to interview witnesses. The court found the record corroborated defendant's statements, referencing pretrial hearing transcripts that showed a defense investigator was appointed on Shultz's motion and that defendant subsequently complained that the investigator had not spoken to anyone regarding his case and that he did not agree with Schultz's "strategy." Margie also testified at the hearing, asserting she was with defendant at the time of the alleged offense and was willing and available to testify at defendant's trial.

¶ 61		To support its finding of ineffective assistance, the court also determined that the State's case against defendant was weak. In particular, it quoted portions of the special concurrence from defendant's direct appeal commenting on the weakness of the evidence in the case. See *Northern*, 2013 IL App (3d) 110231-U, ¶¶ 49-55 (McDade, J., specially concurring). The court ultimately concluded that Schultz performed deficiently by failing "to interview and call" defendant's alibi witnesses and that "based on the evidence," *i.e.*, the weakness of the State's case, defendant was clearly prejudiced. The evidence and arguments presented at the evidentiary hearing support the trial court's factual findings, and opposite conclusions from those reached by the court are not clearly apparent.

¶ 62		Nor did the trial court err in its ultimate conclusion that Schultz provided ineffective assistance. In setting forth its ruling, the trial court relied on *King*. There, the defendant was a school bus driver who was convicted of sexually assaulting a 17-year-old bus passenger. *King*, 316 Ill. App. 3d at 903-04. During postconviction proceedings, the defendant challenged his trial

counsel's failure to call as an alibi witness a bus attendant who would have testified that she was on the bus at the time of the alleged offense and that the defendant was never alone with the complaining witness. *Id.* at 904. The defendant also provided an affidavit stating that he had given his trial counsel the bus attendant's name and told counsel that she could testify on his behalf. *Id.*

¶ 63     In finding error, the First District noted that "case law holds that counsel's tactical decisions may be deemed ineffective when they result in counsel's failure to present exculpatory evidence of which he is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense." *Id.* at 913. It held the bus attendant provided an alibi for the defendant, her statements were "unequivocally exculpatory," and her statements could only have bolstered the defense theory that the defendant did not commit the alleged offense. *Id.* at 914. The statements would also have bolstered the defense's strategy of trying to prove that the State's complaining witness was not credible. *Id.* at 914-15. Significantly, the court pointed out that "mere characterization of counsel's decision not to call an available alibi witness as 'trial strategy' does not preclude inquiry as to the reasonableness of counsel's strategy." *Id.* at 915-16. Further, the court held that it would "decline to assume, without any explanation, that [trial counsel's] failure to call [the alibi] witness was the product of *sound* trial strategy." (Emphasis in original.) *Id.* at 916.

¶ 64     We agree that *King* is instructive. Like in *King*, evidence was presented during the postconviction proceedings in this case of witnesses who could provide an alibi for defendant and bolster the defense theory that defendant did not commit the charged offense. Notably, there was no finding by the trial court that defendant's alibi witnesses were not credible, nor was any evidence presented that indicated their testimony would have been anything other than exculpatory for defendant. Additionally, in *King*, although the defendant's counsel presented witness testimony

- 19 -

on the defendant's behalf, specifically, testimony from three witnesses offered to challenge the credibility of the State's complaining witness, counsel ultimately failed to present exculpatory evidence to rebut testimony from the State's witnesses regarding the defendant's opportunity to commit the charged offenses. *Id.* at 910, 916. In this case, testimony from defendant's alibi witnesses was exculpatory and could have been used to rebut the State's circumstantial evidence placing defendant at the scene of the crime.

¶ 65        Moreover, this case involves circumstances that are even more suggestive of error than in *King*. Specifically, here, the trial court found that not only did Schultz fail to call alibi witnesses but he also failed to investigate defendant's report of an alibi defense. The lack of an investigation into the witnesses and their testimony suggests Schultz did not make an informed strategic decision regarding whether to present that evidence. See *People v. Truly*, 230 Ill. App. 3d 948, 954 (1992) (finding "counsel's decision could not be considered strategic since he failed to investigate" the plausible defenses proffered to him by the defendant).

¶ 66        The dissent suggests defendant failed to carry his burden at the third-stage evidentiary hearing because he did not call Schultz to testify and offered no reason for not calling him. *Infra* ¶ 105. However, we are aware of no authority that would require defendant to present such evidence to establish his claim. Here, defendant relied on his own testimony and that of one of his alleged alibi witnesses to show that Schultz knew about defendant's alibi defense and the names of his alibi witnesses, Schultz declined to investigate an alibi defense, and witnesses existed who could present exculpatory alibi evidence. The court, as the trier of fact, was free to find defendant's evidence credible and sufficient.

¶ 67        We note the State, in opposing defendant's postconviction petition, could similarly have called Schultz as a witness to potentially rebut defendant's evidence or establish why

defendant's alibi witnesses were not investigated or called at trial. "Where a defendant has asserted ineffective assistance of counsel and thereby put in issue the substance of communications between herself and her attorney, the defendant has waived the attorney-client privilege, and it is not error for the trial court to allow counsel to testify as to conversations with the defendant." *People v. O'Banner*, 215 Ill. App. 3d 778, 793 (1991) (finding that where a defendant alleged ineffective assistance of counsel and testified to her communications with her counsel, "the State was not precluded from calling [the] defendant's trial counsel as a witness at [a] hearing on the [defendant's] motion for a new trial"). Here, the State declined to call Schultz as a witness and defendant's testimony about their communications remained unrebutted. The dissent's critique that the State's presentation of Schultz as a witness would somehow result in a "burden shift" or an "ethical quandary" is simply incorrect. *Infra* ¶ 105. Further, given the lack of any explanation from defense counsel regarding a basis for his decisions, this case is like *King*, where the evidence at the evidentiary hearing also included no explanation from the defendant's counsel for his failure to call the defendant's alibi witness.

¶ 68        The dissent next asserts that the pretrial hearing transcripts referenced by the trial court did not show any "correlation" between defendant's alibi witness claim and the court's improper conclusion the exchanges therein "concerned defendant's alibi witnesses." *Infra* ¶ 107. The dissent points out that the pretrial hearing transcripts included specific claims by defendant about other witnesses in the case unrelated to his alleged alibi defense.

¶ 69        Although the transcripts do not show that defendant explicitly mentioned his alleged alibi witnesses at the pretrial hearings, the transcripts do establish that defendant raised a general complaint prior to trial about Schultz's failure to use the court-appointed defense investigator to interview *any* witnesses in the case. This was the basis for which the trial court

referenced the transcripts, and it is supported by the record. Specifically, at the evidentiary hearing, defendant testified that (1) he and Schultz discussed hiring a private investigator to interview witnesses and (2) prior to trial, he complained that the private investigator was not being used. In setting forth its ruling on defendant's postconviction petition, the court noted defendant's testimony "on a private investigator not being used" and referenced the pretrial hearing transcripts that supported his testimony. The transcripts showed the appointment of a defense investigator at Schultz's request, complaints by defendant that the investigator "hasn't spoke to nobody on the case," and a statement by Schultz that he had not "had [the investigator] sent out." The fact that defendant also raised more specific complaints during the pretrial proceedings about witnesses unrelated to his alibi defense does not require a finding that the record contradicted his testimony at the evidentiary hearing or any finding by the court.

¶ 70           Additionally, the State asserts, and the dissent would find, that there were strategic reasons for Schultz's failure to call defendant's alleged alibi witnesses. *Infra* ¶ 110. Both argue and cite case authority supporting the proposition that it may be deemed reasonable trial strategy for trial counsel not to call alibi witnesses who are related to the defendant. However, while cases cited by the State and the dissent support the proposition that it may be reasonable in some circumstances to forgo calling an alibi witness who is a defendant's relative, they do not hold that doing so will *always* be deemed reasonable.

¶ 71           The dissent additionally finds that Margie's testimony at the evidentiary hearing undermined her plausibility as a potential alibi witness because she acknowledged never reporting to anyone that she had alibi information. The dissent finds that from Margie's silence, "one could reasonably infer she may not have cooperated with the court-appointed investigator either." *Infra* ¶ 109. Notably, however, the trial court, as the trier of fact, never made such a determination.

Further, the evidence presented at the third-stage hearing does not require the inference reached by the dissent.

¶ 72 At the evidentiary hearing, Margie maintained that she tried to communicate with Schultz about "alibi information." Specifically, Margie stated she tried to call Schultz's office a few times and left messages but never received a response. She also attended defendant's trial and was told by Schultz "to stand outside" because she would be called as a witness. Margie acknowledged that she did not try to tell Schultz about the alibi information she had, indicating she "just assumed" that was why she was being called as a witness. On cross-examination, Margie further acknowledged that she did not try to approach the police or "anybody like that" to report the alibi information she had, explaining, "[T]hat's what [defendant's] lawyer is for." Ultimately, there is no evidence showing that Margie was ever uncooperative with respect to providing information related to defendant's case. Further, the trial court's comments indicate only that it found Margie could have provided exculpatory alibi evidence on defendant's behalf.

¶ 73 Here, the trial court's factual findings are not manifestly erroneous. Under the circumstances presented, we find no error in the court's determination that Schultz provided ineffective assistance by failing to investigate or call defendant's alleged alibi witnesses and in granting defendant's postconviction petition on that asserted basis.

¶ 74 B. Defendant's Appeal—Grand Jury Proceedings

¶ 75 "A grand jury is a body of laypersons who investigate probable cause free from technical rules." *People v. Basile*, 2024 IL 129026, ¶ 28. Our supreme court has expressed reluctance in "interfer[ing] with the indictment process," and "a criminal defendant may not challenge an indictment of a legally constituted grand jury" absent "narrow exceptions." *Id.* ¶ 30. "A grand jury proceeding is part of the accusatory stage of the criminal justice process, not the fair

trial stage where a defendant's guilt is ultimately determined. *Id.* ¶ 34. "Although the grand jury investigates facts and measures the existence of probable cause, a grand jury does not act as a petit jury, finally adjudicating guilt or innocence, and its proceedings are not minitrials." *Id.* "Its task is merely to assess whether there is adequate basis for bringing a criminal charge, subjecting a defendant to a criminal trial." *Id.*

¶ 76    The legislature has laid out specific grounds to permit the dismissal of a grand jury indictment. As it relates to the specifics of this case, section 114-1(a)(5) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/114-1(a)(5) (West 2008)) permits a defendant to move to dismiss a grand jury indictment where "[t]he indictment was returned by a Grand Jury which acted contrary to Article 112 of this Code [(*id.* § 122-1 *et seq.*)] and which results in substantial injustice to the defendant."

¶ 77    Defendant first contends Garrison's presence at the grand jury proceedings was unauthorized. He also argues Garrison's consistent presence and active role in the grand jury proceedings violated section 112-6(a) of the Code (*id.* § 112-6(a)), which permits "[o]nly the State's Attorney, his reporter and any other person authorized by the court or by law" to attend the sessions of the grand jury. Defendant points to several cases as instructive: *People v. Fassler*, 153 Ill. 2d 49 (1992), *People v. Toolen*, 116 Ill. App. 3d 632 (1983), *People v. Jackson*, 64 Ill. App. 3d 307 (1978), and *People v. Hunter*, 61 Ill. App. 3d 588 (1978).

¶ 78    In *Fassler*, 153 Ill. 2d at 52, the defendant, a teacher, was charged for sexually molesting a 13-year-old student during class. During the grand jury proceedings, the victim's mother—who was not authorized to attend—was present. *Id.* at 53. The victim's mother did not address the grand jury, was not present during any other witnesses' testimony, and was not present during the grand jury deliberations. *Id.* However, during the victim's testimony, the mother did

instruct the victim to " 'calm down.' " *Id.* The trial court, citing section 112-6(a), dismissed the indictment against the defendant pursuant to section 114-1(a)(5) (Ill. Rev. Stat. 1989, ch. 38, ¶ 114-1(a)(5)), which permits the court to grant a motion to dismiss an indictment where the grand jury acts contradictory to article 112 and "results in a substantial injustice to the defendant." *Fassler*, 153 Ill. 2d at 53.

¶ 79 The *Fassler* court rejected a *per se* rule that permitted the dismissal of a grand jury indictment merely for violating section 112-6(a) by permitting unauthorized individuals to be present. *Id.* at 55. Rather, the court noted a substantial injustice must also be demonstrated. *Id.* at 55-56. The court found the victim's mother's presence did not result in a substantial injustice to the defendant because there was no evidence the mother's presence "endangered the secrecy" of the proceedings or "influenced her daughter's testimony or the grand jury's decision." *Id.* at 56.

¶ 80 In *Toolen*, 116 Ill. App. 3d at 645, the defendants contended the presence of investigators during the testimony of other witnesses before the grand jury denied them due process, requiring the dismissal of their indictments. The state's attorney moved pursuant to statute to permit the investigators' authorized presence. *Id.* The investigators did not question any witnesses and were not present during deliberations. *Id.* The appellate court concluded the defendants had not been prejudiced by the investigators' presence. *Id.* at 648.

¶ 81 In *Jackson*, 64 Ill. App. 3d at 312, the State conceded it was error to permit an investigator to ask questions of a grand jury witness. However, the investigator's questions to the witness only "sought further explanation." *Id.* at 313. The court concluded the investigator's questioning did not prejudice the defendant. *Id.*

¶ 82 In *Hunter*, 61 Ill. App. 3d at 593, two police officers were present while witnesses testified before the grand jury. The officers were authorized to be present. *Id.* The appellate court

concluded the officers' presence did not coerce any testimony and, thus, did not prejudice the defendants. *Id.* at 594.

¶ 83     From these cases, defendant contends the instant matter is distinguishable because Garrison's presence was far more pervasive and influential. He argues the error of permitting Garrison's participation in the grand jury proceedings was not harmless because the legislature has limited the instances wherein the State may reindict an individual, citing *People v. Hunter*, 298 Ill. App. 3d 126, 130-31 (1998) (citing 725 ILCS 5/114-1(e) (West 1996)). Defendant asserts Garrison's participation was not a mere technical violation that could be remedied by the State re-indicting him without Garrison's presence because the evidence in the case was so weak it warranted a special concurrence saying as much on direct appeal. See *Northern*, 2013 IL App (3d) 110231-U, ¶¶ 49-55 (McDade, J., specially concurring). Thus, defendant contends without Garrison's participation, there was a reasonable probability no indictment would have been returned at all.

¶ 84     The State argues the record contradicts defendant's claim Garrison was not authorized to be present during the grand jury proceedings. The State notes, during the January 30, 2008, grand jury session, the state's attorney asked Garrison if he had been previously appointed as the grand jury investigator, to which Garrison replied, "Yes." The State also contends defendant has failed to identify a substantial injustice or prejudice he has incurred due to Garrison's participation in the grand jury proceedings.

¶ 85     Regarding the issue of whether Garrison's presence at the grand jury proceedings was authorized, we agree with the State that the record suggests Garrison was a duly appointed as a grand jury investigator. We note the legislature has authorized "others" aside from the state's attorney and his reporter to be present during grand jury proceedings. See 725 ILCS 5/112-6(a)

(West 2008) ("Only the State's Attorney, his reporter and *any other person authorized by the court or by law* may attend the sessions of the Grand Jury." (Emphasis added.)). "The court may appoint an investigator or investigators on petition showing good cause for same and signed by the foreman and 8 other grand jurors. The duties and tenure of appointment of such investigator or investigators shall be determined by the court." *Id.* § 112-5(b). Garrison's sworn and uncontradicted testimony is that he was previously appointed as the grand jury investigator in this matter. Defendant argues there is no documented record of Garrison's appointment or authorization to be present during the grand jury proceedings. However, defendant, as the appellant, "has the burden to present a sufficiently complete record of the proceedings" below. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). "Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Id.* at 392. Nonetheless, "[e]ven when the presence of persons in the grand jury room during testimony is unauthorized, undue influence is not presumed." *Hunter*, 61 Ill. App. 3d at 593-94.

¶ 86      Thus, we are left with Garrison's authorized presence as the grand jury investigator. While it is not clear what Garrison's authorized duties were, we do not condone his described participation in the grand jury proceedings. "The grand jury process is an invaluable part of our system of criminal justice." *Basile*, 2024 IL 129026, ¶ 29. "The grand jury serves as an accusatory body that brings to trial those who may be guilty of a crime [citation], but just as importantly, it also stands as a shield between citizens and the State and secures 'the innocent against hasty, malicious[,] and oppressive prosecution.' " *Id.* (quoting *Wood v. Georgia*, 370 U.S. 375, 390 (1962)).

¶ 87      We recognize the cases defendant cites generally reflect that where a grand jury investigator coerces or otherwise affects the grand jury's deliberations, a defendant is prejudiced

or suffers a substantial injustice. Here, there is no evidence Garrison was present for or otherwise affected the grand jury's deliberations. "[A]n indictment alone does not suffice to establish prejudice." *Toolen*, 116 Ill. App. 3d at 646.

¶ 88      Furthermore, even if we were to assume Garrison's active role during the grand jury proceedings was impermissibly influential such that it amounted to a substantial injustice, we are unconvinced there would have been a reasonable probability no indictment would have been returned absent Garrison's involvement. Had Shultz moved to dismiss the indictment pursuant to section 114-1(a)(5) and been successful, nothing would have prohibited the State from convening a new grand jury without Garrison's active participation to seek a new indictment. Section 114-1(e) provided that where an indictment is dismissed pursuant to 114-1(a)(5), it did "not prevent the return of a new indictment or the filing of a new charge." 725 ILCS 5/114-1(e) (West 2008).

¶ 89      Defendant points to the weakness of the evidence in the case to question whether such a new indictment would have been returned, but "[a]n accused may not challenge an indictment on the ground[s] that it is not supported by sufficient evidence where there is *any* evidence to support the indictment." (Emphasis added.) *Fassler*, 153 Ill. 2d at 61. The record demonstrates there was undoubtedly some evidence to support the indictment, regardless of Garrison's participation level. This is also plainly obvious because there was sufficient evidence to support a conviction beyond a reasonable doubt despite defendant's protestations regarding the weakness of the evidence. See *Northern*, 2013 IL App (3d) 110231-U, ¶ 30. Accordingly, we conclude the evidence was sufficient to support an indictment absent Garrison's participation. Thus, despite the improper role Garrison played, there was no substantial injustice warranting the indictment's dismissal.

¶ 90      Because we find defendant was not prejudiced by the grand jury proceedings, he

cannot show his trial counsel was ineffective for failing to move to dismiss the indictment, nor can he show his appellate counsel was ineffective for failing to raise the issue on appeal. See *People v. Enis*, 194 Ill. 2d 361, 377 (2000) ("The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel.); see also *People v. Simms*, 192 Ill. 2d 348, 362 (2000) (Where the underlying issue lacks merit, a defendant suffers no prejudice; therefore, the reviewing court is not required to examine the merits of the claims not raised by appellate counsel.).

¶ 91                    C. Defendant's Appeal—Gang Affiliation Evidence

¶ 92        Defendant next argues Schultz was ineffective for failing to object to the introduction of his gang affiliation into evidence or otherwise file a motion *in limine* to exclude such evidence. Likewise, he claims appellate counsel was ineffective for failing to raise the issue on appeal. Defendant contends the gang affiliation evidence was prejudicial and irrelevant because Blanks's murder was largely attributed to drugs and money from a robbery gone wrong. Additionally, he argues there was no evidence he was a gang member. In support, defendant cites *People v. Patterson*, 154 Ill. 2d 414 (1992).

¶ 93        In *Patterson*, the defendant was convicted of murdering two elderly individuals after breaking into their home. *Id.* at 427. The defendant admitted to being a member of a gang and entering the victims' home because he needed guns. *Id.* at 459. The *Patterson* court explained:

>    "Evidence of gang affiliation need not be excluded if it is otherwise relevant and admissible. [Citation.] Evidence indicating the defendant was a gang member or involved in gang-related activity is generally held to be admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. [Citation.] Such evidence, however, is only

admissible where there is sufficient proof that membership or activity is related to the crime charged. [Citation] The determination of whether such evidence is admissible is primarily an inquiry into its relevance to the charges." *Id.* at 458.

The *Patterson* court concluded the defendant's gang affiliation was properly admitted to explain the motive behind "otherwise inexplicable murders." *Id.* at 459.

¶ 94　　　　Here, the State contends the evidence was admissible because the testimony of the jailhouse informants indicated they had known defendant and/or Blanks since childhood and had personal knowledge about defendant's and Blanks's gang memberships. Furthermore, the State argues that Blanks was specifically targeted not simply for drugs and money but because he was a drug dealer for a rival gang.

¶ 95　　　　We reiterate the standard from above: to prevail under the *Strickland* standard, "a defendant must prove that defense counsel's performance fell below an objective standard of reasonableness and that this substandard performance created a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Graham*, 206 Ill. 2d at 476.

¶ 96　　　　The evidence at trial showed defendant did have some level of gang affiliation. Christopher McAfee testified he grew up with both Robert Johnson—a codefendant who was acquitted of Blanks's murder—and defendant. Their relationship involved being members of the same gang. Cordney Smith testified he was friends with Blanks and that they were both members of a rival gang to defendant. After Blanks's murder, Smith recalled defendant invoking Smith's rival gang membership and its connection to Blanks's murder.

¶ 97　　　　We are certainly aware that gang membership carries a distinctive form of

prejudice. See *Patterson*, 154 Ill. 2d at 458 ("This court recognizes that, particularly in metropolitan areas, there may be a strong prejudice against street gangs."). "It has been consistently held, however, that where evidence is relevant and otherwise admissible, it is not excluded because it may also have a tendency to prejudice the accused." *Id.* The basis for McAfee's and Smith's relationships with defendant and Blanks is intertwined with their gang memberships. Therefore, we find defendant's gang affiliation was relevant. We find the evidence was also sufficiently related to Blanks's murder. Recall, defendant was charged with murder for repeatedly stabbing Blanks after he had broken into Blanks's home and attacked him as he exited the shower. Defendant's argument on appeal is essentially that a murder under the pretense of a robbery for drugs and/or money is mutually exclusive from that of attacking and killing a rival gang member. We disagree. It is perfectly compatible and reasonable to conclude that one gang member may rob another for drugs and/or money because the other individual is a member of a rival gang.

¶ 98       Accordingly, we find it was not objectively unreasonable for trial counsel to fail to object to the gang affiliation testimony at trial or file a motion *in limine* to exclude such evidence. See *Enis*, 194 Ill. 2d at 377 ("The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel."). For the same reasons, we conclude appellate counsel was not ineffective for failing to raise the issue on direct appeal. See *Simms*, 192 Ill. 2d at 362 (where the underlying issue lacks merit, a defendant suffers no prejudice; therefore, the reviewing court is not required to examine the merits of the claims not raised by appellate counsel). Because we conclude trial and appellate counsel were not ineffective, we find the trial court's judgment was not manifestly erroneous.

¶ 99                              III. CONCLUSION

¶ 100       For the reasons stated, we affirm the trial court's judgment.

¶ 101    Affirmed.

¶ 102    JUSTICE CAVANAGH, dissenting in part:

¶ 103    I agree with the majority on the issues defendant raises on appeal. I write separately because I respectfully disagree with its decision to affirm the issue the State raises on appeal. For the reasons that follow, I would reverse the trial court's decision granting defendant's postconviction petition based on his claim his trial counsel had rendered ineffective assistance by failing to call alleged alibi witnesses.

¶ 104    The trial court granted defendant's petition after (1) implicitly finding credible defendant's claims Schultz had failed to investigate and call alleged alibi witnesses to testify, (2) finding *King* analogous, and (3) citing the weakness of the evidence as explained in the special concurrence in defendant's direct appeal.

¶ 105    While I agree the trial court was under no obligation to search the record for Schultz's 2010 testimony, which the State had failed to bring to its attention, the majority makes much ado about the value of this evidence despite deciding to forgo its consideration. Nonetheless, the court mentioned this hole in defendant's allegations when it noted Schultz's strategic reasons for not investigating or calling the alleged alibi witnesses were unknown. His reasons were unknown because Schultz was never called to testify at the evidentiary hearing. This is not a conflict in the evidence to be resolved by the court as a fact finder. Rather, this was evidence never brought forth by defendant, who carried the burden at the third-stage evidentiary hearing. See *Pendleton*, 223 Ill. 2d at 472-73. Defendant offered no reason for not calling Schultz to testify. A search of the Attorney Registration and Disciplinary Commission website shows he is still, at the time of this court's disposition, actively practicing law in Moline, Illinois. see *Cordrey v. Prisoner Review Board*, 2014 IL 117155, ¶ 12 n.3 (noting courts may take judicial notice of documents

from readily verifiable sources of indisputable accuracy). The majority contends there is no authority that would have required defendant to call Schultz to testify in order to establish his claim and suggests the State could have equally called Schultz to testify but chose not to. First, the majority's contention here misses the point. Defendant's failure to call Schultz goes to defendant's failure to carry his burden at the evidentiary hearing and demonstrates a significant distinction from *King*. Second, the majority's suggestion the State could have called Schultz to testify incorrectly implies a burden shift to the State, when the entire evidentiary burden at the hearing remained with defendant. Additionally, the majority's suggestion would have placed the State's attorney in a potentially difficult ethical quandary with regard to Schultz's duty to defendant as a former client. See, *e.g.*, Ill. R. Prof'l Conduct (2010) R. 1.9(c)(1), (2) (eff. Jan. 1, 2010).

¶ 106        Defendant's failure to present Schultz's testimony at the evidentiary hearing also makes the trial court's reliance on *King* more specious. As the majority notes when reciting the facts from *King*, and the trial court noted similarly, trial counsel for the defendant in *King* testified at the evidentiary hearing. The appellate court was able to conclude counsel had provided no explanation for failing to call the alleged alibi witness because counsel had testified at the evidentiary hearing. From there, the appellate court was unable to conceive of any sound trial strategy justifying counsel's failure to call the alleged alibi witness. Because counsel did not testify at defendant's hearing and I can conceive of sound strategic reasons for counsel failing to call defendant's sister as an alibi witness, I find *King* distinguishable.

¶ 107        The trial court, for its part, did elaborate further by citing pretrial statements made by defendant that he had disagreed with Schultz's "[trial] strategy" and the fact the court-appointed investigator had not been utilized prior to trial. However, the transcripts from the referenced pretrial hearing do not show a correlation between defendant's disagreements regarding strategy

with Schultz and any of his alleged alibi witnesses. During the hearing, the following exchange occurred:

"THE DEFENDANT: I mean, I don't—I'm really not ready to go.

THE COURT: Why not?

THE DEFENDANT: Because we—I mean, I just don't agree with Mr. Schultz's strategy.

THE COURT: Well, that's something you need to work out between yourselves between now and Monday, because otherwise, we're going to trial. Evidently they went down and talked to—

THE DEFENDANT: Yeah, I understand. We talked about that.

THE COURT: *** And basically, my understanding is—and I don't mean to put words in Mr. Schultz's mouth—but basically, it's not your benefit to bring him up here.

Is that a fair statement, Mr. Schultz?

MR. SCHULTZ: Fair statement.

THE COURT: So it's one of those situations where if you've got witnesses… You control whether you testify or not at a trial.

THE DEFENDANT: Right.

THE COURT: Mr. Schultz controls the rest of the trial in terms of putting on the witnesses, because basically, he is trying to defend you to the best of his ability.

THE DEFENDANT: Understand.

THE COURT: And you may not agree with necessarily all the strategy, but you also need to understand that's his job. You determine whether you're going to testify or not, and basically, you always have the right to question what he's doing, but the ultimate control of the trial is up to him okay?

THE DEFENDANT: So far, I mean, as far as—I mean, I understand that, Your Honor, but what I'm trying to get at is that—I mean, for the whole time—the whole time I've been real patient with him and we—as far as like—it was—You ordered—it was an order put in for the—for the my discovery. I never received it. I received it, but—"

The only witness issue discussed above involved the pronoun "him," referring to a male witness. Defendant did not disagree, nor did he correct the gendered reference. Defendant's petition does not allege any male alibi witnesses. Defendant then transitioned into complaints about his right to physical custody of discovery materials before turning his frustration to Schultz's use of the investigator:

"THE DEFENDANT: But at the same time, who has [the investigator] spoke to? He hasn't spoke to nobody on the case.

MR. SCHULTZ: I haven't had him sent out. There isn't anybody I need to have—

THE DEFENDANT: See? That's—That's—

THE COURT: [Defendant], just—I did the first trial.

THE DEFENDANT: Understand.

THE COURT: And basically, if these people come in and testify the same way they did at the first trial against you, there is no reason to have an investigator, because they are locked into—everybody's locked into their stories.

THE DEFENDANT: Understand that.

THE COURT: If they come—if they come in and change their story about what they testified to at the first trial, then basically, Mr. Schultz can stand up with a copy of that testimony and impeach them. So it's one of those situations where if it's all the same witnesses is and it's all the same people—

THE DEFENDANT: I was—Not to cut you off. How it come about was that I told him I had witnesses that—that two of the witnesses I spoke to, I mean had got in contact with me had went to the grand jury, and they was willing to come—They said—having somebody come talk with some information, so they— they could pretty much say because they come into play as far as the other—the federal inmates is trying to say that it's—it's one—they spoke to about the incident, and these witnesses said that this never occurred."

Here, defendant's complaint regarding the investigator and purported witnesses did not involve any of the alleged alibi witnesses in his petition. The witnesses at issue were rebuttal witnesses to the State's jailhouse informants. Yet, the trial court, at the evidentiary hearing, concluded the exchanges above concerned defendant's alibi witnesses. This is contradicted by the record the court cited and read therefrom. The court went on to quote the special concurrence from defendant's direct appeal to emphasize the weakness of the State's case and establish prejudice.

¶ 108    While the trial court made no findings directly pertaining to Margie Northern's testimony from the evidentiary hearing, she was, in the end, the only alibi witness defendant

offered. In deference to trial counsel's conduct at the time of trial, I would have found counsel's decision not to call her as a witness was reasonable for two reasons. First, our case law is rife with examples of appellate courts noting trial counsel's decision not to call alibi witnesses who also happen to be relatives is reasonable trial strategy. See *People v. Lacy*, 407 Ill. App. 3d 442, 466 (2011) (finding trial counsel could have reasonably decided the jury would afford the defendant's aunt's testimony "less weight"); *People v. Barcik*, 365 Ill. App. 3d 183, 192 (2006) (finding, because the witness was the defendant's fiancée, she "likely would not have been considered a credible witness"); *People v. Deloney*, 341 Ill. App. 3d 621, 635 (2003) (finding "the alibi witnesses were [the] defendant's cousins and, as such, their credibility may have carried little weight"); *People v. Dean*, 226 Ill. App. 3d 465, 468 (1992) (finding counsel's decision not to call three potential alibi witnesses who were relatives of a codefendant was trial strategy). Because Northern, defendant's sister, may have been biased, counsel could have been reasonably concerned with her credibility.

¶ 109 Second, Northern's testimony at the evidentiary hearing undermined her plausibility as a potential alibi witness. She testified she never told trial counsel she had alibi information. In fact, she testified she never told the police, or anybody, for that matter, she had alibi information. Given her silence, one could reasonably infer she may not have cooperated with the court-appointed investigator either.

¶ 110 The trial court's decision failed to account for the strong presumption we should afford counsel's decisions whether to call or not call alleged witnesses as matters of trial strategy. Instead, the court opted to fill in the vacuum of counsel not testifying by misreporting the pretrial record and reinforcing the weakness of the State's case at trial. However, the weakness of the State's case further supports counsel's decision at the time. Despite meaningfully challenging the

State's utterly thin case at trial, counsel's performance is now considered incompetent because he failed to call defendant's sister to testify as to his whereabouts despite her admission she had not informed anyone, let alone trial counsel, about her alibi information. It is not the case here that trial counsel offered no meaningful adversarial testing of the State's evidence at trial. We must remember "ineffective assistance of counsel refers to competent, not perfect, representation." *People v. Easley*, 192 Ill. 2d 307, 344 (2000).

¶ 111 The idiom "hindsight is 20/20" could not be more apt here. Our supreme court has previously explained:

> "Guiding our review of defendant's claim is the principle that decisions concerning whether to call certain witnesses on a defendant's behalf are matters of trial strategy, reserved to the discretion of trial counsel. [Citation.] Such decisions enjoy a strong presumption that they reflect sound trial strategy, rather than incompetence [citation], and are, therefore, generally immune from claims of ineffective assistance of counsel. [Citation.] This is not the case, however, where counsel's strategy was so unsound that no meaningful adversarial testing was conducted." *Enis*, 194 Ill. 2d at 378.

Moreover, when determining whether trial counsel's performance was objectively unreasonable, it is "on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002).

¶ 112 The trial court failed to consider trial counsel's conduct at the time of defendant's trial; rather, the court concluded in hindsight more from counsel was required. This diverges from what *Strickland* demands of our review:

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effect of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

¶ 113 Accordingly, I respectfully dissent from the majority's decision to affirm the trial court's order granting defendant's petition and would have reversed the court's judgment on this issue.